PEATROSS, J.
L Claimant Jon Roberts appeals from a judgment of the Office of Workers’ Compensation (“OWC”) dismissing his demand for compensation benefits. For the reasons stated herein, we affirm.

FACTS

After his employer denied his claim for indemnity and medical benefits, Jon Roberts filed a formal claim for workers’ compensation on June 17, 2005, seeking those benefits plus penalties and attorney fees. The employer answered the claim, denying that there was an accident and further alleging that Mr. Roberts had forfeited his right to benefits by falsely denying a prior injury. Mr. Roberts filed an amended claim for compensation in June 2006 asking additionally for mileage reimbursement; the employer again denied the occurrence of an accident and asserted fraud on the part of the claimant. The matter went to trial before the OWC on July 20, 2006; and, on December 29, 2006, the OWC dismissed the employee’s claim.
Mr. Roberts worked as a laborer for D & J Construction (“D & J”). Mr. Roberts has an eighth-grade education and has worked as a mechanic or laborer most of his life. On April 13, 2005, Mr. Roberts was working for D & J at a jobsite near U.S. Highway 167 in Bernice, Louisiana. He and fellow workers rode together in a crew truck to and from the job site. According to Mr. Roberts:
I’d used a sledgehammer all that day, bending over steel rods about — about five, six inches or so tall, about as big around as my finger, with a sledgehammer bending them over in a drain system. And I was hot and tired. I sat the hammer down at the — run it might-near all day on both sides of the road. And jumped in [crew leader Charles “Little Brother”] Scott’s truck, 12went up the street, went up the road there a little piece. He said, “Jon, jump out and get that road closing sign.” I said, “Okay.” So I got out and walked over— over there and reached down on the bottom of the road closing sign down toward the bottom of it, and it had three *814 or four, like eighty-pound sacks of sand on it. I pulled up, and when I pulled up I heard something snap in my back two or three times.
Mr. Roberts said that he immediately told his co-workers what had happened:
I told them that I had something wrong with me, that I didn’t feel right — something wasn’t right with me.
Charles Scott, who was driving the truck, said “Not to my knowledge” when asked if Mr. Roberts had told him that day at the job site that he had been hurt picking up a sign. Mr. Scott also testified that Mr. Roberts did not tell him of any injury later that evening when the crew returned to the D & J office. Mr. Scott said that he would have made a report of the incident had Mr. Roberts reported it.
Mr. Roberts did not go to work the next day, April 14, but instead, went to E.A. Conway Medical Center in Monroe. A hospital record in the form of a letter dated April 18, 2005, states that Mr. Roberts was at E.A. Conway on April 14, 2005, “to schedule an appointment with the Orthopedics Clinic.”
Mr. Scott testified that, when Mr. Roberts did not show up for work, he called him to find out why he did not come in. Mr. Roberts did not have a telephone in his house, but his next-door neighbor, Carolyn King (who is also Mr. Roberts’ sister), had a telephone that Mr. Roberts used for his calls. Mr. Scott reached Mr. Roberts’ brother-in-law on the morning of April 14, but was unable to speak with him.
| oMr. Roberts testified that he finally spoke to Mr. Scott on the phone later in the day on April 14. According to Mr. Roberts:
I told [Scott] that I had went to Charity Hospital and I pulled — I pulled some stuff loose in my back, and you know — I was letting him know. I asked him what I — what he thought I needed to do. He said, “You need to call Jerry Lynn.”
Jerry Lynn Hackworth was the D & J superintendent in charge of work crews that included Mr. Roberts’ crew. Mr. Roberts’ sister testified that she heard Mr. Roberts tell Mr. Scott “that he had gotten hurt and that was why he was not at work.”
Mr. Scott initially testified that he spoke with Mr. Roberts on April 14, but later explained that he had actually spoken with Mr. Roberts on Friday, April 15. Mr. Scott further testified that he did not at that time ask Mr. Roberts what was wrong with him. Mr. Scott testified that Mr. Roberts told him that “something was wrong” with him, but testified that Mr. Roberts did not tell him that Mr. Roberts had gone to the hospital.
Mr. Roberts testified that, after speaking to Mr. Scott, he then called Mr. Hack-worth:
I told Mr. Hackworth that I had went to E.A. Conway, down there at the charity hospital, and that I pulled something loose in my back, and something wasn’t right with me.
Mr. Roberts said that Mr. Hackworth responded this way:
He turned around and told me-he said, “Well, I’ve got to decide if I’m going to fire you or if I’m going to let you go,” like that. He said, “I’ll call you back in a couple of days.”
Mr. Hackworth said that he talked to Mr. Roberts on April 15, not April 14, and that Mr. Roberts said that “he had something wrong with him” and was going to the hospital. Mr. Hackworth said he did not ask Mr. Roberts what |4was wrong with him and said that Mr. Roberts did not volunteer any information. Mr. Hack-worth had been at the jobsite all day on April 13, 2005, and testified that Mr. Rob *815 erts never said anything about being hurt that day.
Mr. Roberts further testified that Mr. Hackworth called him back on April 15:
He called me back ..., said something about he talked with a Mr. Jerry Wyatt, or something to that effect, and said, “They say I can’t just lay you off, that I’ve got to fire you. So I think I’m just going to go that route.” [He said], “We’re just going to fire you.”
Mr. Hackworth agreed that he discharged Mr. Roberts from employment, but asserted that it was a “disciplinary layoff” because Mr. Roberts had not shown up for work. Mr. Hackworth recalled that D & J’s company policy is to terminate an employee when the employee has two unexcused absences in one year, and he recalled that Mr. Roberts had several unexcused absences in the year before he was fired. D & J is also an at-will employer. Mr. Hackworth recalled the absences because, at another jobsite, he often picked Mr. Roberts up to drive him to work and “a couple of times,” he did not show up at the pick-up point. After informing Mr. Roberts that he was going to be discharged, Mr. Hackworth called the company’s human relations director, Pam Shockley, for guidance and also contacted the company’s chief financial officer, Terry Baugh. After conferring with those people, Mr. Hackworth called Mr. Roberts back and fired him.
| fjAfter he had been fired, Mr. Roberts attended his previously scheduled appointment at E.A. Conway Medical Center on April 18, 2005. The medical record from that date states in part:
Chief Complaint: C/O chronic back pain — wants pain shot
[[Image here]]
Back problems off & on since '98 accident This incident since he “pulled something” Tuesday moving signs (road closure signs)
The doctor administered anti-inflammatory medicine, muscle relaxants and painkillers and made Mr. Roberts an appointment to return in a month.
Mr. Roberts came to D & J’s office on April 20, 2005, to get his last check. There, he spoke with Ms. Shockley, who had prepared the formal termination documents for D & J. Ms. Shockley testified that she put no reason on the documents for Mr. Roberts’ termination. She testified:
[H]e was telling me that he thought he hurt his back. And at that point, I said, “Jon, I don’t deal with that. That needs to be reported to your supervisor and the forms filled out.”
Later that night, Ms. Shockley called Mr. Roberts at home and informed him that he had the right to draw unemployment benefits. She testified that she had never done this before, but said that she probably contacted Mr. Roberts after she learned from Mr. Hackworth that the company did not plan to oppose any claim that Mr. Roberts might file.
On May 18, 2005, Mr. Roberts returned to E.A. Conway for his appointment. The medical record from his visit with Dr. George Belchic on that date reflects, in part:
RCC: LBP
“Something snapped in my back 13 April 05 was swinging a sledge hammer @ work for D & J Construction”
“Had tailbone twisted in a wreck (car)” “No relation to present problem”
Dr. Belchic gave Mr. Roberts a steroid shot and an anti-inflammatory shot. An x-ray of Mr. Roberts’ spine showed normal features, and no pathology was found to explain his complaints of pain. A physical therapist recommended that he do physical *816 therapy in the form of stretching exercises.
Both the April 18 and May 18, 2005 medical reports refer to an auto accident in which Mr. Roberts had injured his back. He testified that the accident happened in Florida; he said that a speeding van crashed into his truck and nearly pushed his truck off a bridge into the water. Mr. Roberts further explained that his doctor in Florida restricted him only to light duty work because of his injury.
Whether Mr. Roberts reported this pri- or injury and the restriction to D & J was a contested issue of fact. When he first went to work for D & J in February 2004, Mr. Roberts underwent a brief interview and completed a second-injury fund questionnaire. Mr. Roberts testified that, when he spoke with D & J employee Deanna Graves at the interview, he told Ms. Graves of his work restrictions and that she wrote “light duty only holding the stop sign flagging” on his interview form. Ms. Graves did not remember whether Mr. Roberts had told her this, but another employee present at the time, Daniel Walker, testified by deposition that he heard Mr. Roberts tell 17Ms. Graves of his back problems and that Mr. Roberts said he needed to be kept on light duty because of his bad back. Walker also testified that Mr. Roberts told him in mid-April 2005 that he had hurt his back at work while “using a sledgehammer.”
The original questionnaire was not available because D & J had destroyed all of the company’s original questionnaires after the company’s insurance adjuster, Steven LeBlane, discovered that the typeface on the questionnaires was too small. The replacement questionnaire, executed later, was introduced into evidence. The company had all of its employees execute a new second-injury fund questionnaire on November 15, 2004, at a companywide banquet. On this second questionnaire, there is a section in the beginning asking the employee whether he currently has, or previously had, any of a list of numerous medical conditions; one of the choices is “neck / back injury.” Mr. Roberts did not check any of the preexisting conditions and, apart from the date and his name / signature, did not write anything else on the two-page multiple question form except his height, weight and social security number. Mr. Roberts said that he only completed the form in this manner because Mr. Scott told him to “just do what I do and sign it.” Mr. Scott testified that he did not recall telling Mr. Roberts to do that.
Mr. Roberts continued to seek medical care for his back pain in June and December 2005, but D & J refused to pay for the treatment. Dr. Belchic found no objective reasons for Mr. Roberts’ complaints of pain at those appointments, and Mr. Roberts did not keep his appointments for the | ¿recommended physical therapy or followup appointments with Dr. Belchic. Dr. Belchic was of the opinion, at least at that time, that Mr. Roberts was able to return to his old job.
As previously stated, Mr. Roberts filed a formal claim for compensation in June 2005. Mr. LeBlane was also the claims representative who handled Mr. Roberts’ claim and made the decision to deny the claim. In making that decision, Mr. Le-Blanc interviewed Mr. Hackworth, Mr. Scott and Ms. Batson, and also interviewed Mr. Roberts. Mr. LeBlane concluded that Mr. Roberts had not been injured at work and that he had never reported any prior back injury to the company.
A portion of Mr. LeBlanc’s testimony at trial gave rise to a controversy about the employer’s position on the occurrence of an accident. The following is an exchange *817 between the claimant’s attorney, Mr. Le-Blanc and the court:
Q (Claimant’s attorney): Let’s cut to the chase here. You didn’t deny the claim because you’re denying an accident. Correct?
[[Image here]]
A: Initially we did, and then we — we probably, at that point, turned our attention to 1208.1.
Q: Are you still maintaining that there was no accident?
A: I — the problem I have is that ...
Q: No, no, no. Answer my question. Are you still ...
[[Image here]]
A: The problem I have is that the people that Mr. Roberts told me were going to corroborate his version of the incident, when |9I spoke to them, they did not. They unequivocally denied. You know, it was like night and day, and that was a problem for me.
Q (By the court): Now answer his question with a yes or no. Are you still denying that there was an occurrence of an accident?
A: No.
Q (By the court): You’re not denying it?
A: (negative nod)
Q (By the court): Okay.
Q (By claimant’s attorney): So the sole basis for denying it—
A: I mean, it sounds like he has reported in the medical record that there was an incident — I think he’s also reported elsewhere, which is also problematic to me as I sit here, that it occurred while he was swinging a sledge.
Q: Both of those are accidents, aren’t they?
A: Yes.
Q: So we’re not disputing an accident?
A: I think — I think that — I mean, he reported it. I can’t sit here and tell you we’re not disputing an accident, because the — the way he reported it and the people he relied on as witnesses that would corroborate what he said and who he reported it to, unequivocally denied it.
Q: Okay. I’m going to leave this alone.
A: I guess whether or not there was an accident—
Q: You are unsure—
A: — is a legal question.
Q: — as to the grounds—
[[Image here]]
A: I would just say, Judge, that whether or not an accident occurred is going to be a legal conclusion that you come to linwith all the evidence that’s presented before you. And if you come to that, I don’t have a problem with it. My concern is that the — when I took a statement from him and he told me what had occurred and who he reported it to, when I took statements from those people it didn’t — it didn’t corroborate it.
Q (By the court): All right, so what’s the answer to the question, because now you’ve given two different answers? Are you disputing that an accident occurred? That’s a yes or no.
A: On the face of it, probably not.
Q (By the court): Okay.
Q (By the claimant’s attorney): So that means the only grounds to deny this claim is 1208.1 fraud. Right?
A: Yes.
Q: That’s the real reason you denied the claim?
A: It was, I think motivator for me, yes.
*818 On cross-examination, the employer’s attorney had this exchange with Mr. Le-Blanc:
Q (Employer’s attorney): Mr. Le-Blanc, you were sitting here in the courtroom and you heard Charles Scott testify that Mr. Roberts did not tell him about hurting himself by picking up a sign on April 13, 2005, either at the worksite or at the shop and you heard Mr. Roberts testify just the exact opposite. Can you tell me why, after hearing that testimony that today you’re not disputing that Mr. Roberts had an accident?
A: I think that based on the medical reports that they showed to me and his statement to the — to—-in there. I still had a question in my mind that there was an accident, and I guess the — it would only be based on, you know, what’s the medical — the medical reports. But the fact that there are factual questions on — from the people that were supposed to corroborate his statement that an accident occurred, it does — it did form a basis for me that there was a question of whether an accident occurred.
On redirect examination, Mr. LeBlanc explained further:
InQ (Claimant’s attorney): As I understand your testimony, you’re not disputing the fact of the accident or the injury?
A: I have serious questions in my mind about it. And what you — ... you simply showed me that medical report, and if I’m going to look at the medical report on the face of it, and that’s the only thing you look at, then yes, you would be led to believe there was an accident. But if you talk to the other witnesses and follow-up with who he says he reported it to, and if they’re to be believed, then you have serious questions about whether an accident occurred. So, do I have questions? Yes.
The court took the matter under advisement. On October 28, 2006, the court announced its ruling and reasons for ruling. The court noted that the medical examinations and images that had been done found no objective cause for Mr. Roberts’ complaints of pain and summarized the testimony of the fact witnesses. The court stated:
Claimant sought medical treatment following the alleged injury. But according to medical records of E.A. Conway Hospital, claimant wanted a pain shot for a chronic back pain. He reported having back problems since a 1998 automobile accident.
The court found that Mr. Roberts’ varied descriptions of how the accident happened and the absence of corroboration from witnesses whom he claimed to have told of his injury
discredited him and ... cast serious doubt on his version of the accident. Furthermore, his testimony is not corroborated by the circumstances following the alleged incident. He did not report an injury and medical treatment was sought for a chronic condition.
The court also concluded that the medical evidence did not entitle Mr. Roberts to any indemnity benefits as his treating physician in 2005 placed no limitation on his ability to return to work. Finally, the court concluded that Mr. Roberts’ failure to answer the second-injury | ^questionnaire truthfully by informing the company of his 1998 back injury was fatal to his claim. From the judgment dismissing his claim in accordance with these reasons, Mr. Roberts now appeals.

*819
DISCUSSION

Assignment of Error Number 1: Steve LeBlanc, who made the decision to deny Roberts’ claim, testified under oath, in response to questions by opposing counsel and the Trial Judge, that he no longer denied that Roberts had suffered a workplace accident or injury; therefore, it was reversible error for the WCJ to disregard that admission and 'rule that no accident occurred.

Assignment of Error Number 2: Roberts went to E.A. Conway for treatment the morning after his accident; his claims of injury were corroborated by other witnesses; and he actually received medical treatment for a back injury; therefore, it was reversible error for the WCJ to rule that no accident or injury occurred.

Citing La. C.C. art. 1853 and Tabeo Exploration, Inc. v. Tadlock Pipe & Equipment, Inc., 617 So.2d 606 (La.App. 3d. Cir.1993), unit denied, 625 So.2d 1057 (La.1993), Mr. Roberts first argues that the trial court erred by failing to take the testimony of Mr. LeBlanc as an admission or judicial confession by the employer that he had suffered an accident at work. Mr. Roberts also argues that the trial court was manifestly erroneous in finding that he failed to prove the occurrence of an accident.
In order to recover workers’ compensation benefits, an injured employee must prove by a preponderance of the evidence that he suffered “personal injury by accident arising out of and in the course of his employment.” La. R.S. 23:1031(A). An “accident” is defined as an
unexpected or unforseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration.
haLa. R.S. 23:1021(1).
A worker’s testimony alone may be sufficient to discharge this burden of proof, provided two elements are satisfied: (1) no other evidence discredits or casts serious doubt upon the worker’s version of the incident and (2) the worker’s testimony is chrroborated by the circumstances following the alleged incident. Bruno v. Harbert International Inc., 593 So.2d 357 (La.1992). Corroboration of the worker’s testimony may be provided by the testimony of fellow workers, spouses or friends or by medical evidence. Id.
In determining whether the worker has discharged his or her burden of proof, the trial court should accept as true a witness’s uncontradicted testimony, although the witness is a party, absent “circumstances casting suspicion on the reliability of this testimony.” Id., citing West v. Bayou Vista Manor, Inc., 371 So.2d 1146 (La.1979). The trial court’s determinations as to whether the worker’s testimony is credible and whether the worker has discharged his or her burden of proof are factual determinations not to be disturbed on review unless clearly wrong or absent a showing of manifest error. Id.
La. C.C. art. 1853 provides:
A judicial confession is a declaration made by a party in a judicial proceeding. That confession constitutes full proof against the party who made it.
A judicial confession is indivisible and it may be revoked only on the ground of error of fact.
Whether Mr. Roberts suffered an accident is a question of fact. Several D & J employees were present at the jobsite at the time when 114Mr. Roberts allegedly had his accident, and two of these employees *820 other than Mr. Roberts testified at trial. Only Mr. Roberts, however, testified that anything unusual happened while he was moving the temporary sign, and both of the other employees present denied that Mr. Roberts contemporaneously told them that he had injured himself.
Mr. LeBlanc was not present at the job site when this alleged accident occurred. He had no personal knowledge of whether Mr. Roberts had been injured while moving a sign, or while using a sledgehammer or in any other way. Mr. LeBlanc reviewed documents and interviewed witnesses after the incident in furtherance of processing Mr. Roberts’ claim for compensation benefits. Mr. LeBlanc’s knowledge of the incident was only derivative; and his testimony about whether Mr. Roberts suffered an accident on April 13, 2005, gave his impression of what the evidence and medical records showed. The occurrence of an accident was a disputed fact with direct evidence on both sides of that question, and Mr. LeBlanc’s opinion testimony does not constitute an admission or judicial confession under those circumstances.
Moreover, Mr. LeBlanc’s testimony on this point was confused and contradictory. At times, the witness seemed to be agreeing that the evidence proved the occurrence of an accident; at other times, he expressed his doubt that the evidence was sufficient. He explained that his decision to deny Mr. Roberts’ claim was ultimately based in Mr. Roberts’ answers to the second-injury questionnaire, not on the occurrence of an accident. Even if Mr. LeBlanc was an eyewitness to the events on April 13, 2005, his hstestimony would likely be insufficient to constitute a judicial confession because of its internal contradiction.
The remaining question is whether the trial court was manifestly erroneous or clearly wrong in finding that Mr. Roberts failed to prove the occurrence of an accident.
When findings are based on determinations regarding the credibility of witnesses, the manifest error-elearly wrong standard demands great deference to the trier of fact’s findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a fact-finder’s finding, is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.
Rosell v. ESCO, 549 So.2d 840 (La.1989) (citations omitted).
In this court’s review of the trial court’s reasons for judgment, we observe that the trial court did not recite that the April 18, 2005 medical record from E.A. Conway contained the sentence, “This incident since he ‘pulled something’ Tuesday moving signs (road closure signs).” Instead, the trial court observed that the hospital records showed that Mr. Roberts sought treatment “for a chronic back pain” that he suffered since his 1998 car accident. The trial court, however, also noted that, “on other occasions claimant described his injury as occurring due to the lifting of a heavy sign.” Given that the trial court apparently was aware of Mr. Roberts’ initial claim, |ir,the initial discrepancy between its reasons and the April 18, 2005 *821 record is insufficient to undermine confidence in the trial court’s finding of fact.
This case presented to the trial court a difficult question of fact, with contradictory evidence on both sides of the issue and evidence suggesting various degrees of bias or self-interest in the evidence presented by both sides. To reverse a fact finder’s determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that thé finding is clearly wrong. Mart v. Hill, 505 So.2d 1120 (La.1987). The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the fact finder’s conclusion was a reasonable one, and, where there are two permissible views of the evidence, the fact finder’s choice cannot be manifestly erroneous or clearly wrong. Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993).
After a review of the entire record, including the medical records and other exhibits, we cannot say that the trial court’s choice to reject Mr. Roberts’ claim that he had an accident at work was manifestly erroneous. Even so, there are troubling aspects about the evidence, in particular the evidence that tends to show that Mr. Roberts went to the hospital for treatment on April 14, 2005, instead of going to work and that he did so before he had been fired. In addition, the circumstances and timing surrounding his termination were unusual. In the end, however, the lack of corroboration for Mr. Roberts’ version of events, his differing statements to doctors and his co-employee, Mr. Walker, about the origin of 117his injury and the absence of any medical evidence to support the occurrence of any new injury were sufficient evidence, viewed in the light of the record as a whole, for the trial court to reject Mr. Roberts’ testimony.
Accordingly, because the trial court found that Mr. Roberts failed to prove that he suffered an accident at work and because that finding is not manifestly erroneous, his claim for workers’ compensation benefits must fail.

Assignment of Error Number 3: It is D & J’s burden of proving each element of fraud under La. R.S. 23:1208.1; D & J’s form is ambiguous and Roberts’ failure to complete- the form, in the absence of any effort by D & J to clarify the ambiguity, fails to meet the requirements of 23:1208.1 as stated by the Louisiana Supreme Court; therefore, it was reversible error for the WCJ to rule that Roberts’failure to complete the form was fraud.

Assignment of Error Number ⅛: Roberts told D & J he could only work light duty when he was hired, and that D & J wrote down that information. D & J destroyed the original second injury fund questionnaire Roberts filled out when he was hired; therefore, it was reversible error for the WCJ not to apply an evidentiary presumption in favor of Roberts based on D & J’s spoliation of evidence.

Although this court’s approval of the finding of the trial court that the claimant failed to prove that he suffered an accident is sufficient to affirm the judgment of the trial court, we, nevertheless, will address the claimant’s other assignments of error. These assignments concern the effect of the absence of the original second-injury questionnaire and the trial court’s conclusion that Mr. Roberts had forfeited his right to benefits because, on the second form, Mr. Roberts failed to inform the company of his prior back injury.
La. R.S. 23:1208.1 provides:
*822 Nothing in this Title shall prohibit an employer from inquiring about previous injuries, disabilities, or other medical conditions |1sand the employee shall answer truthfully; failure to answer truthfully shall result in the employee’s forfeiture of benefits under this Chapter, provided said failure to answer directly relates to the medical condition for which a claim for benefits is made or affects the employer’s ability to receive reimbursement from the second injury fund. This Section shall not be enforceable unless the written form on which the inquiries about previous medical conditions are made contains a notice advising the employee that his failure to answer truthfully may result in his forfeiture of worker’s compensation benefits under R.S. 23:1208.1. Such notice shall be prominently displayed in bold faced block lettering of no less than ten point type.
The form that Mr. Roberts completed in November 2004 bears the required bold-type warning of forfeiture for failure to answer truthfully. Mr. Roberts admitted that he suffered a back injury in 1998 — the same type of injury he claims to have suffered in 2005 — but he argues (1) that he informed the company of that injury on his original form, now missing because the company destroyed it, and (2) that the form is ambiguous because it only asks for affirmative statements of injury and not denials of injury.
Forfeiture is a harsh remedy; therefore, statutory forfeiture provisions such as La. R.S. 23:1208.1 must be strictly construed. Nabors Drilling, USA v. Davis, 03-0136 (La.10/21/03), 857 So.2d 407. In Wise v. J.E. Merit Constructors, Inc., 97-0684 (La.1/21/98), 707 So.2d 1214, the supreme court considered an employer’s defense under La. R.S. 23:1208.1 to a compensation claim made by an employee who had executed a second-injury questionnaire. In that case, the claimant suffered traumatic arthritis and fluid on his right knee while working for a former employer. That condition cleared up after a week, and the worker resumed his normal [iaduties. About two years later, the worker went to work for- a new employer and filled out a second-injury fund questionnaire. The form asked the worker if he suffered from a variety of ailments, but this form included check boxes for both “yes” and “no” answers. The employee originally marked “yes” where the form asked about knee injuries, but later marked out his answer; he also left blank the question asking about arthritis. A few months later, the employee injured his right knee while working for the new employer, and he reinjured the same knee a few months later.
The worker made a claim for compensation benefits, but the employer denied the claim, citing La. R.S. 23:1208.1. The OWC agreed and dismissed the worker’s claim even though the court found that the worker minimized his prior knee problems because they were minor to him. The court of appeal found no manifest error, but the supreme court reversed. The court first observed:
La. R.S. 23:1208.1 thus provides for forfeiture under narrow circumstances: There must be an untruthful statement; prejudice to the employer; and compliance with the notice requirements of the statute. Resweber v. Haroil Const. Co., 94-2708, 94-3138 (La.9/5/95), 660 So.2d 7. An employer has the burden of proving each element within the statute. The lack of any one of the elements is fatal to an employer’s avoidance of liability. Mullins v. Courtney Equipment, 95-989 (La.App. 3 Cir. 1/31/96), 670 So.2d 329.
The court then observed:
A survey of cases indicates that an employee/applicant had failed to answer *823 truthfully only when he clearly indicated “no” on the employer’s questionnaire, denying the existence of a known medical condition. (Citations omitted.) There has been no case in which an employee has scratched out a “no” answer, thereby revealing ambiguities, as in the present case.
|2nIn addition to other issues, the court addressed the ambiguity of the form in that case in light of the employer’s burden of proof:
Claimant’s interpretation that the question was asking about chronic conditions, coupled with a questionnaire not narrowly tailored to meet [the employer’s] need to be informed about PPDs, renders [the employer’s] questionnaire ambiguous. Ambiguous forms are to be construed against the employer when considering whether the employee knowingly answered untruthfully.
The record shows that claimant did not answer the question concerning arthritis and scratched out a “No” answer to the question about knee problems. On the face of the questionnaire, claimant’s answers are not untruthful, but rather ambiguous. A defendant employer is charged with proving each element entitling it to reimbursement.
Therefore, ambiguous answers cannot satisfy an employer’s burden of proving knowledge regarding the presence of a PPD. Absent an employer’s attempt to clarify ambiguous answers, an employer fails to prove that claimant has knowingly made an untruthful answer for which forfeiture is justified.
In response to claimant’s ambiguous answers, [the employer] did nothing. It never questioned claimant regarding those ambiguous answers, nor did it seek to clarify the ambiguity and thereby inform itself as to the existence of a PPD as required by La.R.S. 23:1378. Therefore, [the employer] did not reasonably attempt to satisfy its statutory knowledge requirement. Under the circumstances of this case, where an ambiguous questionnaire is coupled with an employee’s ambiguous response, [the employer] has failed to prove that claimant knowingly failed to answer the questionnaire truthfully.
In this case, we perceive no ambiguity in the form as it applies to the instant situation. The form asks the employee to “check if you currently have or previously had the following medical conditions” and provides a line for the employee to place a check mark next to each condition or illness. Mr. Roberts placed no check by the “Neck /Back Injury” question, so there was no ambiguous answer on this form to prompt the employer to further inquire into Mr. Roberts’ medical history. Contrast Bossier Electric v. Cubley, 35,852 (La.App.2d Cir.6/14/02), 821 So.2d 685, where the claimant answered the questions truthfully, but the questions were found to be ambiguous as they related to the employee’s prior medical treatment.
Likewise, the evidence did not suggest that the employer had an improper motive for destroying its old second-injury forms and replacing them with new forms; according to the testimony, the old forms were not in compliance with La. R.S. 23:1208.1. Noncompliant forms may not provide an employer with the protection afforded them by the legislature, see Wilkes v. Ivan Smith Furniture Co., 39,-096 (La.App.2d Cir.12/22/04), 890 So.2d 780, and there is no particular reason for an employer to keep a form that is not in compliance with the law.
In regard to the relationship in this case between the new injury and the prior injury, there was insufficient evidence of any injury to the employee in which to make a determination of the relationship between *824 his prior injury and any new injury. The medical records, however, indicate that, on April 18, 2005, Mr. Roberts told his doctor of his prior injury when he complained of his back pain, thereby indicating that the complaints were similar in location. On this record, the trial court was not manifestly erroneous in concluding that the employer proved that Mr. Roberts was not entitled to benefits by operation of La. R.S. 23:1208.1.

CONCLUSION

For the foregoing reasons, the judgment of the Office of Workers’ Compensation is affirmed at appellant’s cost.
AFFIRMED.