McCALLUM, J.
*619 In this workers' compensation case, the employee-appellee is Alex Turner ("Turner"). The employer-appellant is Chicago Bridge & Iron Co. ("Chicago"). Turner was working as a carpenter's helper for Chicago when he injured his lower back. The workers' compensation judge ("WCJ") determined that Turner was entitled to Supplemental Earnings Benefits ("SEB"), physical therapy, a $6,000 penalty, and $14,500 in attorney fees. The WCJ also denied Chicago's fraud claims under to La. R.S. 23:1208 and 23:1208.1 ("Section 1208" and "Section 1208.1").
Chicago appeals the judgment on the grounds that the WCJ committed manifest error in finding: (1) Turner is entitled to SEB; (2) Chicago failed to prove fraud under Section 1208; and (3) Chicago failed to prove fraud under Section 1208.1.
Turner answered the appeal asking for an increase in the amount of attorney fees and the penalty assessed against Chicago. For the following reasons, we increase Turner's attorney fee award to $17,500, and affirm the WCJ's judgment in all other respects.
FACTS
Chicago hired Turner as a carpenter's helper at a construction site near Hackberry, Louisiana, on August 19, 2016. After being hired, but before commencing work, Turner completed the LA OWCA Second Injury Board Knowledge Questionnaire ("questionnaire").
On September 29, 2016, Turner suffered a lower back injury while working as a carpenter's helper, and immediately reported the injury to his supervisor. Immediately after the accident, he was taken to Prime Occupational Medicine ("Prime"), the onsite medical facility. An X-ray of Turner's back, taken by Dr. Henry Vreeland, revealed findings of mild degenerative disc disease and facet degenerative joint disease. Turner was also diagnosed with an acute lumbar strain. He was released to return to work for full regular duty with no restrictions. Turner was directed to take Motrin for pain, do physical therapy, and apply ice and heat to his back.
However, Turner testified that he did not return to work as a carpenter's helper. Instead, he was required to be at the onsite medical facility from 6:00 a.m. to 6:00 p.m. each working day, sitting around with 20 other injured employees. On occasion, they were required to sit in classes regarding trades other than those for which they had been hired. These classes included courses for electricians and heavy equipment operators. Predominantly, he and the others just sat around all day.
On October 4, 2016, Turner was reevaluated at Prime after complaining of back pain. He was again released to return to assigned duties, and was directed to use heat packs three times a day. On October 10, 2016, Turner had another followup visit at Prime, where he again reported significant pain. He was again cleared to return *620 to work with restrictions[1] until after the scheduled MRI, which was taken October 14, 2016.
Dr. Victor McCoy, the interpreting radiologist, summarized his findings from the October 14, 2016, MRI as follows:
Impression: there are disc bulges and facet arthropathy along the lumbar spine with broad posterior disc herniations at the L3-L4, L4-L5, and L5-S1. The changes at L3-L4 cause mild spinal canal narrowing. The changes at L4-L5 cause severe narrowing of the lateral aspects of the spinal canal where I suspect there is some impingement upon the traversing L5 nerve roots bilaterally. The changes at L5-S1 cause severe narrowing of the left lateral aspect of the spinal canal where I suspect there is impingement upon the traversing left S1 nerve root. There are levels of mild-to-moderate foraminal narrowing but no apparent compromise of the existing nerve roots.
These findings were included in Turner's medical records at Prime.
On October 17, 2016, Turner had another followup visit with Prime, where he again reported back pain. He was again cleared to work with this same restrictions.
On October 24, 2016, Turner was evaluated by Dr. Collins, an orthopedist, who cleared Turner for sedentary work only. He prescribed Mobic and Norco for pain, and Robaxin, a muscle relaxer. He instructed Turner not to drive while on muscle relaxers or narcotic pain medication. Dr. Collins also prescribed physical therapy three times a week for four weeks.
Turner testified that Joel Dennison, a Chicago employee, advised him that he was subject to random drug screens at any time, and if he was found to have narcotic pain medications in his system while on the plant site, he would be immediately terminated.
Turner was reassigned to light-duty work, specifically, sorting "I CARE" cards.[2] However, Turner complained that the new work also hurt his back as he had to lean over a table when sorting the cards. Accordingly, he refused to continue sorting the cards. On November 4, 2016, Chicago fired Turner for the stated reason of insubordination, as Turner refused to do the sedentary work that had been assigned to him.
STANDARD OF REVIEW
Factual findings of an OWC judge are subject to the manifest error standard of review on the OWC's findings of fact; therefore, in order for a reviewing court to reverse an OWC judge's factual findings, it must find that a reasonable factual basis does not exist and the record establishes that the factual findings are clearly wrong. Lafayette Bone & Joint Clinic v. Louisiana United Bus. SIF, 2015-2037 (La. 6/29/16), 194 So.3d 1112 ; Dean v. Southmark Construction, 2003-1051, p. 7 (La. 7/6/04), 879 So.2d 112, 117.
Ultimately, the issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. If the factual findings are reasonable in light of the record reviewed in its entirety, a reviewing court may not *621 reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Stobart v. State, supra ; Dombrowski v. Patterson-UTI Drilling Co., supra.
The manifest error standard of review is based upon the trial court's observation of live testimony, as contrasted from an appellate court's access only to a cold record, and also "upon the proper allocation of trial and appellate functions between the respective courts." Henderson v. Nissan Motor Corp. , 2003-606 (La. 2/6/04), 869 So.2d 62, 69, citing Stobart v. State through Dep't of Transp. & Dev. , 617 So.2d 880, 883 (La. 1993). Accordingly, where two permissible views of the evidence exist, the fact-finder's choice between them cannot be manifestly erroneous or clearly wrong. Id.
TURNER'S ENTITLEMENT TO SUPPLEMENTAL EARNINGS BENEFITS
La. R.S. 23:1221(3)(a)(i) provides for the payment of SEB:
For injury resulting in the employee's inability to earn wages equal to ninety percent or more of wages at time of injury, supplemental earnings benefits , payable monthly, equal to sixty-six and two-thirds percent of the difference between the average monthly wages at time of injury and average monthly wages earned or average monthly wages the employee is able to earn in any month thereafter in any employment or self-employment, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee at the time of the injury was particularly fitted by reason of education, training, and experience, such comparison to be made on a monthly basis. Average monthly wages shall be computed by multiplying his wages by fifty-two and then dividing the product by twelve.
(Emphasis added.)
Section 1221(3)(c)(i) allows the employer to defeat an employee's otherwise valid claim for SEB, as follows:
[F]or purposes of Subparagraph (a) of this Paragraph, if the employee is not engaged in any employment or self-employment...the amount determined to be the wages the employee is able to earn in any month shall in no case be less than the sum the employee would have earned in any employment or self-employment...which he was physically able to perform , and (1) which he was offered or tendered by the employer or any other employer, or (2) which is proven available to the employee in the employee's or employer's community or reasonable geographic region.
(Emphasis added.)
In Brown v. Offshore Energy Serv., Inc., 47, 392 (La. App. 2 Cir. 8/8/12), 104 So.3d 494, 502-3, we explained the relationship between the two above provisions found in Section 1221:
Initially, [under Section 1221(3)(a)(i),] the employee bears the burden of proving by a preponderance of the evidence that the injury resulted in his inability to earn...[at least 90% of his pre-accident income]... under the facts and circumstances of the individual case. Poissenot v. St. Bernard Parish Sheriff's Ofc., supra [2009-2793 (La. 1/9/11), 56 So.3d 170]. Only when the employee makes this initial showing does the burden shift to the employer to prove that the employee is physically able to perform a certain job and that the job was offered to the employee or that the job was available to the employee in his or the employer's community or reasonable geographic area.
*622 La. R.S. 23:1221(3)(c)(i) ; Poissenot v. St. Bernard Parish Sheriff's Ofc., supra.
Chicago contends that, because it provided Turner with a sedentary job (sorting I CARE cards) which yielded him the same amount of income, Turner is precluded by Section 1221(3)(c)(i) from entitlement to SEB. Chicago further contends that Turner's termination did not render Section 1221(3)(c)(i) inapplicable because he was fired for insubordination. Thus, Chicago argues, his post-firing inability to earn at least 90% of his pre-accident wages was a result of that insubordination rather than the work accident. Turner argues that he was not physically able to sort the I CARE cards because doing so increased his back pain.
Turner further asserts that, by requiring him to be present at the job site in Hackberry from 6:00 a.m. to 6:00 p.m. every workday, Chicago in effect required him to forgo the medication and physical therapy Dr. Collins had prescribed. This is, he argues, because of Chicago's worksite drug policy. Indeed, despite his inability to return to work as a carpenter's helper, Turner never went to physical therapy while still employed by Chicago.
We find no manifest error in the WCJ's decision regarding Turner's entitlement to SEB.
FRAUD
Chicago raises affirmative defenses under two separate "fraud" statutes that would result in forfeiture of workers' compensation benefits. To trigger forfeiture under Section 1208, the employee must be proven to have committed intentional falsity and this intentional falsity must have been for the purpose of obtaining workers' compensation benefits.[3] Conversely, Section 1208.1 does not explicitly require a dishonest intention. An untruthful response to the health history questionnaire regarding a condition which directly relates to the condition for which workers' compensation benefits are claimed is apparently sufficient to trigger forfeiture, provided the health history questionnaire is in proper form. There is jurisprudence suggesting dishonest intent may also be necessary. See infra .
Section 1208
La. R.S. 23:1208 provides, in relevant part:
A. It shall be unlawful for any person, for the purpose of obtaining or defeating any benefit or payment under the provisions of this Chapter, either for himself or for any other person, to willfully make a false statement or representation.
.....
E. Any employee violating this Section shall, upon determination by workers' compensation judge, forfeit any right to compensation benefits under this Chapter.
Because forfeiture of workers' compensation benefits is a harsh remedy, Section 1208 must be strictly construed. Green v. Allied Bldg. Stores, Inc., 50, 117 (La. App. 2 Cir. 1/22/16), 185 So.3d 164, 169, writ denied , 2016-0508 (La. 5/27/16), 192 So.3d 737.
Chicago's reconventional demand. Chicago filed a reconventional demand alleging that Alex Turner committed fraud in violation of Section 1208. In paragraphs IV through VII of the reconventional demand, Chicago alleges that Turner fraudulently testified during his discovery deposition that:
[P]rior to the work accident he had not been involved in any kind of accident, *623 slip and fall, car wreck, or of any other nature[.]
[T]he only treatment to his back previously [sic] to the work accident when he was 16 years old and went to a chiropractor to pop his back once, maybe twice, and an MRI/x-ray taken approximately a year and a half before the work accident as a result of a motor vehicle accident[.]
[T]he only treatment to his back outside of a motor vehicle accident and the treatment when he was 16 years old was for the work accident[.]
[H]e had not, outside of the motor vehicle accident discussed above undergone a [sic] x-rays or MRI of his back[.]
Also, in paragraphs VIII through XI, Chicago made allegations concerning Turner's nondisclosure of prior medical conditions and incidents which had nothing to do with his preexisting lower back problems. Chicago, in full, argued:
Outside of the misrepresentations about his pre-existing lumbar condition, Turner was also not truthful in disclosing other preexisting conditions. Turner made at least 12 misrepresentations, by not admitting same in his deposition, about not undergoing regular treatment for anxiety or presenting to emergency room for various medical conditions... Even though not related to the work accident injury, this shows a pattern of Turner's failure to truthfully answer questions about his pre-existing conditions.
We find no manifest error in the WCJ's finding that the evidence associated with these allegations was insufficient to prove fraud under Section 1208.
Turner's deposition . In its brief, Chicago cites the following testimony in Turner's deposition as fraudulent:
Q: I also note in this report, the October 4 prime report, you said that you were involved in a motor vehicle accident approximately a year ago and had an x-ray of her cervical spine, lumbar spine, and T-spine. Do you recall that?
A: Yes, ma'am.
Q: Here they put that you never had any pain from that motor vehicle accident. Is that correct?
A: No, ma'am.
Q: Why is that not correct?
A: Well, I mean, I had a slight whiplash, is what it was. That's the reason I got the x-ray.
Q: So would it be fair to say the pain was in your neck? Or was it in your neck and back?
A: Yes, ma'am, I had pain in my neck. I was just stiff because I had whiplash from getting hit.
Q: And about how long did that last?
A: Maybe a week and a half.
Q: But you had no pain in your lower back as a result of that car accident?
A: No, ma'am.
(Exhibit D-4, pp.51, lines 4-24).
Q: Mr. Turner, prior to this work accident have you ever had treatment to your back outside of that motor vehicle accident we discussed earlier when you went to the ER?
A: I went to-I was probably 16, I believe. I went to-I was having-I don't remember what it was. It was something in my upper back and I went and got-I went to a chiropractor and he popped my back. Other than that, no, ma'am.
Q: You said that was in your upper back?
A: Yes, ma'am.
Q: Do you know where the chiropractor was?
*624 A: Ashdown, Arkansas.
Q: Do you by chance recall his name?
A: No, ma'am, I don't.
Q: Did you see him more than once?
A: I think I seen him twice.
Q: And just to the best of your memory, it was just because it was bothering you?
A: Yes, ma'am.
Q: Not a result of any kind of accident, a slip and fall or a car wreck or anything of that sort?
A: No, ma'am.
Q: Prior to this work accident do you ever remember having any-not the one after the motor vehicle accident, but did you have any other x-rays or MRIs taken of your back?
A: No, ma'am.
(Exhibit D-4, pp.81-2). (Emphasis added).
The chiropractor Turner saw was a Dr. "Knight"[4] in Ashdown Arkansas. Dr. Knight's medical records contains a document consisting of a picture of a person and a request for the patient to indicate the location of his pain by marking on that picture; the left hip and left lower back are marked as the locations of pain. The patient further indicated that the severity of this pain was an "8/10". Apparently, this document was completed on March 4, 2015. Dr. Knight's records also indicate that Turner had an MRI of his back on May 1, 2015. The report based on this MRI discussed the L3-L4, L4-L5, and L5-S1 levels of Turner's back, finding disc protrusions, mild degenerative conditions, mild spinal stenosis, and "lateral recess narrowing" in that section of the plaintiff's back. However, this report bears no indication that Turner had a herniated or ruptured disc. Dr. Knight's records indicate that Turner's "trauma history" includes riding "dirt bikes," and that Turner rode either a "bull" or "bulls."[5] ' Ashdown Medical Clinic record states:
HPI: he rides bulls-and just over time his pain started-been hurting eight months-C/O left hip pain and radiates to left foot causing left foot to be numb. Then a few days ago his low back started hurting-and he states this hurt to his back is a lot worse than it was to his hip. He got adjusted by Dr. K[n]ight twice a week for 4 to 5 weeks then had a few additional visits also. He did order an MRI of his back.
Mr. Turner presents with low back pain. The discomfort is most prominent in the lower lumbar spine. It does not radiate. He characterizes it as constant. This is a chronic problem, with essentially constant pain. He states that the current episode of pain started 7 to 8 months ago. The event which precipitated this pain was bull riding.
Turner's deposition testimony that he did not remember having an MRI other than for the 2015 motor vehicle accident is contradicted by these medical records, which indicate that he had an MRI of his lumbar spine on May 1, 2015, some 18 months prior to the instant work accident. It is feasible, however, that Turner did not recall the May 1, 2015, MRI in the midst of his deposition.
Turner's testimony that Dr. Knight (the chiropractor) treated him for upper back pain is contradicted by Dr. Knight's records and Ashdown Medical Clinic's records.
*625 Nonetheless, this testimony could have been Chicago's means of finding Turner's records from Dr. Knight and Ashdown Medical Clinic. Thus the WCJ could reasonably have concluded that Turner did not intend to conceal this part of his medical history from Chicago.
Turner's responses to request for admission . In its brief, Chicago makes further allegations of fraud.[6] First, in response to Chicago's first set of requests for admission, numbers 18 and 19, Turner denied receiving medical treatment for his "lower back" prior to the instant work accident, and more specifically, denied receiving prior treatment for "the portion of his back injured on September 29, 2016," in the instant work accident. These responses would appear to contradict Turner's medical records from Dr. Knight and Ashdown Medical Clinic. Again, however, Turner's deposition testimony could have been what enabled Chicago to find these medical records. Therefore, the WCJ reasonably could have concluded that Turner had no intent to deceive Chicago.
Second, Chicago's second request for admissions, number 4, stated: "admit that you underwent treatment for low back pain and had radiating left pain [sic] in your left foot pain [sic] for approximately eight months prior to May 27, 2015." Turner responded: "plaintiff admits he was treated on May 27, 2015, but denies that such treatment was for low back pain and left foot pain for approximately eight months prior to May 27, 2015." This request for admission is rendered ambiguous by multiple typographical errors and imprecise language. We therefore cannot say that Turner's response is contradicted by the medical records.
Third, in response to Chicago's second request for admissions, number 5, Turner denied that the injury being treated was caused by bull riding. The Ashdown Medical Clinic records do state that bull riding "precipitated" the pain being treated. However, Turner and his mother both testified that he only rode a bull once, on his 17th birthday, which was several years before the instant work accident. We also note that, generally, whether bull riding caused the preexisting bulging and protruding discs in a claimant's back is not relevant to his entitlement to workers' compensation benefits. Here, the only relevance is that Chicago has used the bull riding matter to create a Section 1208 issue.
Turner's trial testimony. Finally, at trial, Turner was confronted with Dr. Dietze's opinion that the two MRIs did not reflect any changes to Turner's spine. These MRIs had been performed before and after the work injury, respectively. Dr. Dietze found that neither MRI reflected a herniated disc. (Exhibit P-8, pp. 9-10). Dr. Dietz's interpretation of the MRI taken after the instant work accident was similar to the MRI report outlined in connection with the May 1, 2015, MRI.[7] Turner disagreed with that interpretation of the MRIs.
We note that Dr. Victor McCoy, the radiologist who initially interpreted Turner's October 14, 2017, MRI, diagnosed *626 Turner with "broad posterior disc herniation" at the L3-L4, L4-L5, and L5-S1 joints. (Exhibit P-5, pp. 36).[8] Dr. Collins echoed this finding of herniated discs in his records.
Accordingly, it would not have been manifest error for the WCJ to conclude that Turner and Dr. McCoy were correct and Dr. Dietze was incorrect and that therefore Turner's statement was not false. Alternatively, even if the WCJ credited Dr. Dietze's opinion over that of Dr. McCoy, it would not be manifestly erroneous to conclude that Turner's open disagreement with Dr. Dietze did not constitute fraud. This can be true when the situation is viewed in light of Dr. McCoy's opinion.
Conclusion regarding section 1208. Fraud under Section 1208 requires: (1) an intentionally false statement; (2) made for the purpose of obtaining workers' compensation benefits. The evidence, as outlined above, does suggest that Turner may possibly have intentionally made false statements. However, we are constrained to find no manifest error in the WCJ's conclusion that Chicago failed to prove that Turner made these potentially false statements for the purpose of obtaining workers' compensation benefits.
Section 1208.1
La. R.S. 23:1208.1 provides:
Nothing in this Title shall prohibit an employer from inquiring about previous injuries, disabilities, or other medical conditions and the employee shall answer truthfully; failure to answer truthfully shall result in the employee's forfeiture of benefits under this Chapter, provided said failure to answer directly relates to the medical condition for which a claim for benefits is made or affects the employer's ability to receive reimbursement from the second injury fund. This Section shall not be enforceable unless the written form on which the inquiries about previous medical conditions are made contains a notice advising the employee that his failure to answer truthfully may result in his forfeiture of worker's compensation benefits under R.S. 23:1208.1. Such notice shall be prominently displayed in bold faced block lettering of no less than ten point type.
(Emphasis added).[9]
Forfeiture of workers' compensation benefits based on the claimant's failure to truthfully answer a medical questionnaire is a harsh remedy; therefore, Section 1208.1 is strictly construed. Roberts v. D & J Const. Co., 42, 510 (La. App. 2 Cir. 11/14/07), 969 So.2d 811, writ denied , 2007-2404 (La. 2/15/08), 976 So.2d 178. Ambiguous questionnaires are construed against the employer in determining whether an employee knowingly failed to answer the questionnaire truthfully. Wise v. J.E. Merit Constructors, Inc. , 1997-0684 (La. 1/21/98), 707 So.2d 1214 ; Dugas v. AutoZone, Inc. , 2012-727 (La. App. 3 Cir. 12/5/12), 103 So.3d 1271, writ denied , 2013-0045 (La. 2/22/13), 108 So.3d 775. The WCJ's determination regarding forfeiture *627 of benefits under Section 1208.1 is subject to manifest error review. Id.
There is no dispute that Turner filled out the Section 1208.1 questionnaire prior to beginning work for Chicago, or that the questionnaire included the necessary warning. Thus, the only issues are: (1) whether Turner failed to answer truthfully, and (2) if so, whether this failure directly relates to the medical condition for which benefits are claimed, or affects Chicago's ability to receive reimbursement from the second injury fund.
Chicago does not allege or argue that Turner had a "herniated" or "ruptured" disc in his back prior to the instant work accident. Aside from mere conclusory allegations, Chicago's only allegation in its supplemental reconventional demand is that Turner's checking "no" in response to the question asking whether he had a "herniated" or "ruptured" disc in his back was untruthful in light of his prior diagnosis of "bulging" and "protruding" discs in his lower back.
Again, the questionnaire did not specifically ask whether Turner had "bulging" or "protruding" discs. Chicago treats the question about "herniated" or "ruptured" discs as requiring Turner's disclosure of his "bulging" and "protruding" discs. However, Chicago does not cite any evidence supporting the proposition that bulging/protruding discs are synonymous with herniated/ruptured discs.[10] Furthermore, in brief, Chicago does not otherwise address this threshold issue of whether Turner made an untruthful response to a question on the form, except for the assertion that he "did not disclose his pre-existing back condition."
In response, Turner points out that his response was truthful: the questionnaire did not ask whether he had a "bulging" or "protruding" disc. We are compelled to conclude that it was not manifest error for the WCJ to conclude that Chicago failed to prove Turner's above response was somehow untruthful.
At trial, Chicago also argued that the instructions on the form required Turner to list every medical condition he had that was not specifically addressed elsewhere on the form. Page 2 of the questionnaire requires the employee to check "yes" or "no" next to each disease, medical condition, and surgery listed thereon. It further instructs the employee, "[f]or all conditions that you check yes, write a brief explanation on the Explanation Page." Except for indicating that he had a surgical procedure on his collar bone in 2012, Turner checked "no" next to all items on page 2.
Page 3 of the questionnaire, the "Explanation Page," has instructions materially differing from those on page 2. Specifically, it directs the employee to "use the space below to explain the illnesses and/or conditions that you checked Yes (Y) or any other medical conditions that may not be listed on this form. " (Emphasis added).
Chicago argues that Turner's nondisclosure of his preexisting bulging and protruding discs, in light of this instruction, violated Section 1208.1. We disagree. The instruction for the employee to disclose and explain "any other medical conditions not listed on this form" is overbroad and places an excessive burden on the employee. It is the employer's responsibility to ask the questions it wants answered. For example, had Chicago's questionnaire *628 asked if you "have ever had a back injury or been treated for back pain," Turner would have been prompted to think about and required to disclose his preexisting back condition and prior treatment. In contrast, Chicago's instruction quoted above does not prompt the employee to think about particular medical conditions he or she experienced in the past. Imposing such an expansive and open-ended disclosure obligation on employees, under penalty of forfeiture of workers' compensation benefits, is impermissible.
Answer to appeal: increase of attorney fees and penalties
Pursuant to La. R.S. 23:1201(F), the WCJ awarded Turner $14,500 in attorney fees and $6,000 as a penalty assessed against Chicago. Turner requests that the penalty be increased to the maximum of $8,000 and the award of attorney fees be increased to over $50,000.
We find no manifest error in the $14,500 attorney fee award or the $6,000 penalty. However, we increase the attorney fee award by $3,000 as compensation for the cost of defending against Chicago's appeal.
DECREE
With all costs of this appeal assigned to appellant, the judgment of the Workers' Compensation Court is affirmed. Turner's attorney fee award is increased to $17,500.
AFFIRMED, AS AMENDED.

Restrictions included limited bending and twisting; no lifting, carrying, pushing or pulling more than 10 pounds.

Chicago uses I CARE cards to gather information regarding health and safety risks at the job site. Employees who notice potentially hazardous conditions fill out a card reporting such and turn the card in to the I CARE department, which then organizes the cards into various categories.

It does not explicitly require materiality of the false statement.

The chiropractor's surname is alternatively spelled "Knight" and "Kight" throughout the record. For the purpose of consistency only, we spell it "Knight."

It appears that first the word "bulls" was written, then the letter "s" on the end of that word was scratched through.

Turner did not object to the introduction into evidence of these requests for admission. Accordingly, to the extent, if any, that these allegations are beyond the scope of the allegations made in Chicago's reconventional demand, the pleadings are thereby enlarged. La. C.C.P. art. 1154. This is so despite the requirement of La. C.C.P. art. 856 that fraud be pled with particularity. Durham v. Evans , 377 So.2d 423 (La. App. 2 Cir. 1979).

The May 1, 2015, MRI results are summarized earlier in this opinion.

Dr. McCoy's impression based on the October 14, 2016, MRI is block quoted in full on pages 619-20 of this opinion.

Additionally, the Third Circuit has held that, to trigger forfeiture, the employee must have the intent to deceive the employer in making the false statement on the questionnaire. Hickman v. Jim Smith Logging, 2004-157 (La. App. 3 Cir. 9/29/04), 883 So.2d 1072. See Wise v. J.E. Merit Constructors, Inc. , 1997-0684 (La. 1/21/98), 707 So.2d 1214, 1219 ("ambiguous questionnaires are to be construed against the employer in determining whether the employee knowingly failed to answer the questionnaire truthfully").

Chicago also does not cite any evidence that, if such is the case, Turner somehow should have known that bulging/protruding discs are synonymous with herniated/ruptured discs.