# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

FROM: CLERK OF SUPREME COURT OF LOUISIANA


The Opinions handed down on the **29th day of June, 2016**, are as follows:


**BY HUGHES, J.**:


2015-C -2137      LAFAYETTE BONE & JOINT CLINIC (CHARLES MORRIS), ET AL. v.
    C/W       LOUISIANA UNITED BUSINESS SIF, ET AL.
2015-C -2138
              As set forth herein above, we reverse, in part, the appellate
court's modification of the amount awarded by the OWC and affirm,
in part, the decision of the appellate court to award penalties
and attorney fees.
REVERSED IN PART; AFFIRMED IN PART.

              KNOLL, J., concurs and assigns reasons.
WEIMER, J., dissents and assigns reasons.
GUIDRY, J., concurs and assigns reasons.

06/29/2016

SUPREME COURT OF LOUISIANA

No. 2015-C-2137

LAFAYETTE BONE & JOINT CLINIC (CHARLES MORRIS), ET AL.
VERSUS LOUISIANA UNITED BUSINESS SIF, ET AL.

CONSOLIDATED WITH

No. 2015-C-2138

LAFAYETTE BONE & JOINT CLINIC (CHARLES POOLE, JR.), ET AL.
VERSUS GUY HOPKINS CONSTRUCTION CO., INC., ET AL.

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL, THIRD
CIRCUIT, OFFICE OF WORKERS' COMPENSATION, DISTRICT 4

HUGHES, J.

We granted writs in these cases to review the appellate court decisions, which awarded unreimbursed prescription medication costs beyond the $750 limitation set forth in LSA-R.S. 23:1142(B) and awarded penalties and attorney fees, on appeal of the Louisiana Office of Workers' Compensation ("OWC") decision, which denied penalties and attorney fees and limited the reimbursements for prescription medications to the $750 statutory limit. For the reasons that follow, we reverse the appellate court in part and affirm in part.

FACTS AND PROCEDURAL HISTORY

Both of the injured employees in these cases, Charles Morris and Charles Poole, were treated at the Lafayette Bone & Joint Clinic ("LB&J"); Mr. Morris was treated by Dr. Louis Blanda and Mr. Poole by Dr. John Cobb. During the

course of treatment by these doctors, both Mr. Morris and Mr. Poole were prescribed medications, which were dispensed at LB&J by LB&J employees.

On June 5, 2008, the workers' compensation payor, Louisiana United Business SIF ("LUBA"), sent letters to LB&J and its doctors stating that LUBA would no longer pay for prescription medications directly dispensed by LB&J and directing LB&J doctors to issue future prescriptions for the instant injured employees that could be filled at local retail pharmacies.[1] LUBA-insured injured employees had previously been issued prescription medication cards, which allowed them to fill their prescriptions at local retail pharmacies without any out-of-pocket expense.[2] Despite these notices and subsequent denials of requests for reimbursement of dispensed prescription medications, LB&J doctors continued to dispense prescription medications to these injured employee patients throughout 2008 (on seven occasions to Mr. Morris and on five occasions to Mr. Poole) and to submit requests for reimbursement to LUBA. LUBA declined payment for these requests, citing its prior June 5, 2008 notice.

LB&J and the treating physicians thereafter filed disputed claim forms with the OWC, seeking to recover the cost of the medications dispensed, along with penalties and attorney fees. Following a joint trial in these two cases, the OWC judge ruled that the plaintiff/health care providers' recovery for medications

---

[1] In addition to the June 5, 2008 letters, LUBA had in the two previous years (2006 and 2007) directed letters to Dr. Blanda, Dr. Cobb, and LB&J, informing them that the workers' compensation claimants enrolled with LUBA had been provided a prescription card, allowing them to fill their prescriptions with the card at local retail pharmacies at a lower cost, and requesting that LUBA claimants be allowed to use the prescription card program when filling prescriptions issued by LB&J doctors.

[2] The letter accompanying the prescription cards sent to LUBA-insured injured employees informed the injured employees that the prescription card was provided "for those drugs prescribed by your workers' compensation authorized physicians" and that when the card was used at a participating pharmacy the injured employee would "have **no out-of-pocket expenses or any claims forms to complete**." Forty-eight retail pharmacies were specifically named in the letter as participating pharmacies (including Albertsons, CVS, Fred's, Health Mart, Kmart, Rite Aid, Sam's Club, Schwegmann, Target, Walgreens, Walmart, and Winn-Dixie). Two toll free phone numbers and an Internet website address were also provided for injured employees to obtain the names of other participating pharmacies, as the letter stated, "We have many local independent pharmacies, too numerous to list here."

2

dispensed after June 5, 2008 was limited by LSA-R.S. 23:1142(B)[3] to $750 for each injured employee, since the medications were dispensed as nonemergency treatment by the plaintiff/health care providers without the consent of the payor. Further, the OWC judge found that no penalties or attorney fees were warranted because LUBA had clearly advised the plaintiff/health care providers that no further reimbursement would be made for prescription medications dispensed by LB&J doctors after June 5, 2008.

The plaintiff/health care providers appealed, seeking an increase in the amount awarded and an award of penalties and attorney fees. Concluding that the OWC decision was manifestly erroneous, in finding that the prescription medications dispensed after June 5, 2008 in connection with authorized LB&J office visits were not also authorized and in finding that there was a valid reason for LUBA to have denied reimbursement for the medications at issue, the appellate court affirmed in part and reversed in part, increasing the amounts awarded from $750 to the full amounts charged for the medications by the plaintiff/health care providers and awarding penalties and attorney fees pursuant to LSA-R.S. 23:1201(F)(4).[4]

Thereafter, this court granted the defendants' applications for certiorari. See **Lafayette Bone & Joint Clinic v. Louisiana United Business SIF**, 15-2137 (La.

---

[3] Section 1142(B) provides, in pertinent part:

> **Nonemergency care.** (1)(a) Except as provided herein, each health care provider may not incur more than a total of seven hundred fifty dollars in nonemergency diagnostic testing or treatment without the mutual consent of the payor and the employee as provided by regulation. Except as provided herein, that portion of the fees for nonemergency services of each health care provider in excess of seven hundred fifty dollars shall not be an enforceable obligation against the employee or the employer or the employer's workers' compensation insurer unless the employee and the payor have agreed upon the diagnostic testing or treatment by the health care provider.
>
> * * *

[4] LB&J and Dr. Blanda were awarded $2,000 in penalties and a total of $4,125 in attorney fees in the Charles Morris case, and LB&J and Dr. Cobb were awarded $2,000 in penalties and a total of $3,750 in attorney fees in the Charles Poole case.

2/5/16), 186 So.3d 1170; **Lafayette Bone & Joint Clinic v. Guy Hopkins Construction Co.**, 15-2138 (La. 2/5/16), 186 So.3d 1171. The defendants have presented the following assignments of error to this court: (1) the appellate court erred in holding that a choice-of-pharmacy issue could not be raised in this health care provider-filed action; (2) the appellate court erred in holding that LUBA could not limit their authorization, granted to a health care provider for certain medication treatment, to specifically withhold its consent for the *dispensing* of pharmaceutical medications; and (3) the appellate court erred in awarding penalties and attorney's fees to the plaintiffs.

## LAW AND ANALYSIS

The resolution of the issues presented in these cases turns on the proper application of LSA-R.S. 23:1142(B), which directs that, unless otherwise provided, a health care provider cannot incur more than a total of $750 in nonemergency diagnostic testing or treatment without the mutual consent of the workers' compensation payor and the employee, and any portion of nonemergency service fees in excess of $750 is expressly declared to be an unenforceable obligation against the employee or the employer or the employer's workers' compensation insurer, unless the payor and the employee have agreed on the diagnostic testing or treatment by the health care provider.

Choice of Pharmacy

We first address the assignment of error asserting that the appellate court erred in ruling that a choice-of-pharmacy issue could not be raised in this health care provider-filed action, and we find no error in the appellate court's refusal to consider the choice-of-pharmacy issue, albeit for a different reason.

Citing **Downs v. Chateau Living Center**, 14-0672, pp. 9-10 (La. App. 5 Cir. 1/28/15), 167 So.3d 875, 881; **Bordelon v. Lafayette Consolidated Government**, 14-0304, p. 3 (La. App. 3 Cir. 10/1/14), 149 So.3d 421, 423, writ

4

denied, 14-2296 (La. 2/6/15), 158 So.3d 816, and **Sigler v. Rand**, 04-1138, p. 15 (La. App. 3 Cir. 12/29/04), 896 So.2d 189, 198, writ denied, 05-0278 (La. 4/1/05), 897 So.2d 611, LUBA asserts that the workers' compensation employer/payor is entitled to choose the pharmacy where the injured employee may fill his covered prescriptions. Asserting the contrary, the plaintiff/health care providers cite **Burgess v. Sewerage & Water Board of New Orleans**, 15-0918, pp. 14-15 (La. App. 4 Cir. 2/3/16), 187 So.3d 49, 57-58, which held: "[W]e disagree with the holding in **Bordelon** that the choice of pharmacy belongs to the employer . . . . [W]e find the choice of pharmacy belongs to the employee . . . ."

Unlike LSA-R.S. 23:1121(B)(1) ("The employee shall have the right to select one treating physician in any field or specialty."), there is no explicit workers' compensation law directing that one party has the exclusive right to choose a prescription medication provider. Paragraph (A) of LSA-R.S. 23:1203 directs only that the "employer shall furnish all necessary drugs" for the treatment of an injured employee work-related injury.

Moreover, the evidence presented in these cases does not raise a tenable employee choice issue, as there was no testimony presented from the injured employees (Charles Morris and Charles Poole), the treating physicians (Dr. Blanda and Dr. Cobb), or the nursing staff of the treating physicians. The only witnesses whose testimony was presented to the OWC were: LB&J administrative/clerical employees Simone Clark[5] and Sandy Guidry,[6] who were involved in the

---

[5] Ms. Clark testified about the billing practices at LB&J and account balances of the injured employees at issue in this case. Ms. Clark further testified that each LB&J doctor had his own separate, locked pharmacy cabinet, from which prescription medications were dispensed. She also indicated that she was under the impression that a nurse would have asked patients whether they wanted their prescriptions filled at LB&J or elsewhere.

[6] Ms. Guidry testified that she dispensed medications only for Dr. Hodges, but that she supervised the dispensing of medications by employees for the other LB&J doctors; she also stated that she was responsible for filing claims for reimbursement for the medications dispensed from the doctors' in-house pharmacies. Ms. Guidry testified that when Dr. Hodges' nurse electronically directed a prescription to print out in her office, she would attach a label to the appropriate prepackaged medication (it was not necessary to count out pills and place them in a

5

dispensing of prescription medications and the filing of claims for reimbursement for the medications dispensed to the injured employees; LB&J physician Dr. Daniel Hodges,[7] who was not the treating physician for the patients at issue, but who had treated other injured employee patients and who testified generally about LB&J's practice of dispensing prescription drugs; and LUBA Care Supervisor Clyde Paul Roy, Jr., who testified as to the economic considerations surrounding LUBA's decision not to reimburse for physician-dispensed prescription medications, discussed hereinafter.

Our review of the testimony offered into evidence before the OWC reveals that the plaintiff/health care providers did not establish that the injured employees in these cases made an affirmative choice of LB&J as their prescription medication provider.[8] LB&J witnesses testified only as to the general operating procedures relative to dispensing prescriptions for workers' compensation patients at LB&J in 2008. Because the persons who would have been involved in a discussion about the injured employee patients' choice of pharmacy (the patients, the treating

_____

bottle, as the pills were already sealed in packages of individual prescription quantities, so only a label, bearing the patient's name and dosing instructions, needed to be affixed to the sealed package); the labeled, sealed package was then given to the patient. Ms. Guidry further testified that her first contact with patients during the pertinent time period was when she gave them the medications; she did not ask patients whether they wanted to have their prescriptions filled at LB&J, as she was under the impression that either the treating physician or the nurse had done so.

[7] Dr. Hodges testified that, prior to the opening of a traditional pharmacy (the Falcon Pharmacy) at LB&J in 2009, each LB&J doctor kept a stock of prepackaged medications, which LB&J doctors would prescribe and LB&J employees would dispense to workers' compensation patients as needed. Dr. Hodges was not familiar with the specific procedures relative to the dispensing of, or billing for, prescription medications; he stated that he would order a prescription medication for a patient and give it to his nurse, who would handle the prescription from there. Dr. Hodges indicated that he did not ask his workers' compensation patients whether they wanted their prescriptions filled at LB&J, and he was not sure who would have talked to the patient about where the patient wanted the prescription filled; he stated, "I'm sure at some point they were probably asked."

[8] Cf. **Smith v. Southern Holding, Inc.**, 02-1071, pp. 8-9 (La. 1/28/03), 839 So.2d 5, 10, wherein this court, with reference to LSA-R.S. 23:1121's grant to the injured employee of the right to "select" a physician, indicated that the common usage of the word "select" is synonymous with "choose" and that these words mean, respectively, "to choose in preference to another or others; pick out" and "to select from or in preference to another or other things or persons"; this court rejected the employer's contention that because the injured employee had submitted to treatment by the employer's physician, he had made a de facto choice of a physician.

physicians, and/or the physicians' nurses) did not testify in these cases, there is an insufficient factual basis upon which to adjudicate the validity of a such a choice vis-à-vis LUBA's assertion of the right of choice as the workers' compensation payor.

Nor would resolution of the choice-of-pharmacy issue be dispositive of the matters before the court. As we have stated, these cases hinge on LSA-R.S. 23:1142(B)'s admonition that a "health care provider may not incur more than a total of seven hundred fifty dollars in nonemergency diagnostic testing or treatment without the mutual consent of the payor **and** the employee." (Emphasis added.) In these cases, we conclude hereinafter that the plaintiff/health care providers did not have the consent of the payor, LUBA, even if they had obtained the consent of the injured employees, to dispense prescription medications after June 5, 2008. Therefore, we find no error in the appellate court's refusal to consider the choice-of-pharmacy issue.

Mutual Consent

We next address LUBA's contention that the appellate court erred in holding that LUBA's authorization in these cases (for the two injured employees to obtain medical treatment from LB&J physicians[9]) also encompassed the *dispensing* of prescription medications to the injured employee patients during office visits occurring after LUBA's June 5, 2008 letter (advising that no further LB&J-dispensed prescription medications would be covered).

The June 5, 2008 letters to LB&J and it physicians stated that LUBA "will no longer reimburse for physician dispensed medications" and advised LB&J physicians to "direct our claimants to the nearest retail pharmacy." We find that the effect of this letter was clearly a withdrawal and/or revocation by LUBA of its

_____

[9] The parties do not dispute that LUBA had authorized medical treatment by LB&J physicians or that the pharmaceutical treatment prescribed by LB&J physicians was necessary for the injured employee patients' work-related injuries.

prior consent to the dispensing of prescription drugs by LB&J to its covered injured employees. See e.g. **Tyler v. Rockwood Insurance Company**, 96-0326, pp. 7-8 (La. App. 1 Cir. 2/14/97), 690 So.2d 834, 839, writ denied, 97-0673 (La. 4/25/97), 692 So.2d 1093 (wherein the appellate court upheld a lower court ruling, which held that a payor's consent to medical treatment of an injured employee obligated the payor for the cost of treatment rendered until the date of the payor's notice that no further payments for the medical treatment would be made, as the notice constituted a withdrawal of the earlier consent and/or agreement to pay). Cf. LSA-C.C. art. 2024 ("A contract of unspecified duration may be terminated at the will of either party by giving notice, reasonable in time and form, to the other party.").

Even though, prior to June 5, 2008, LUBA may have obligated itself to reimburse the plaintiff/health care providers for prescription medications dispensed to injured employee patients during in-office medical treatment by LB&J physicians, LUBA's June 5, 2008 letter notified LB&J and its physicians that it would no longer pay for LB&J dispensed prescription medications; therefore, any ongoing consent to, or authorization of, in-office dispensing of prescription medications by LB&J physicians was terminated. No authority has been cited to this court that would require a workers' compensation payor to authorize any and all medical treatment a physician could possibly provide at an office visit simply because the office visit had itself been authorized.

A payor may choose to contest the reasonableness or necessity of any element of a physician's proposed treatment, subject to oversight by the OWC. See LSA-R.S. 23:1034.2(F)(1) ("Should a dispute arise between a health care provider and the employee, employer, or workers' compensation insurer, either party may submit the dispute to the office in the same manner and subject to the same procedures as established for dispute resolution of claims for workers'

8

compensation benefits."); LSA-R.S. 23:1142(D) ("If the payor has not consented to the request to incur more than a total of seven hundred fifty dollars for any and all nonemergency diagnostic testing or treatment . . . and it is determined by a court having jurisdiction in an action brought either by the employee or the health care provider that the withholding of such consent was arbitrary and capricious, or without probable cause, the employer or the insurer shall be liable to the employee or health care provider bringing the action for reasonable attorney fees related to this dispute and to the employee for any medical expenses so incurred by him for an aggravation of the employee's condition resulting from the withholding of such health care provider services."); LSA-R.S. 23:1310.3 ("A claim for benefits, the controversion of entitlement to benefits, or other relief under the Workers' Compensation Act shall be initiated by the filing of the appropriate form with the office of workers' compensation administration . . . . Except as otherwise provided by R.S. 23:1101(B), 1361, and 1378(E), the workers' compensation judge shall be vested with original, exclusive jurisdiction over all claims or disputes arising out of this Chapter, including but not limited to . . . payment for medical treatment . . . ."). See also **Rebel Distributors Corp. v. LUBA Workers' Comp.**, 13-0749, p. 12 (La. 10/15/13), 144 So.3d 825, 834 ("[A] health care provider has a right to pursue an administrative proceeding with the OWC for physician-dispensed pharmaceuticals obtained by injured employees.").

In the face of LUBA's June 5, 2008 denial of consent and/or authorization to the plaintiff/health care providers, the plaintiffs' remedy was to then seek OWC oversight of the dispute, pursuant to LSA-R.S. 23:1034.2(F)(1), LSA-R.S. 23:1142(D), and LSA-R.S. 23:1310.3. However, the plaintiff/health care providers failed to seek an OWC remedy prior to continuing to dispense prescription medications on five to seven occasions after June 5, 2008. Consequently, the provisions of LSA-R.S. 23:1142 became applicable to those five to seven

9

occasions on which prescriptions were dispensed without LUBA's consent. Therefore, we conclude that the OWC judge properly imposed the $750 reimbursement restriction set forth in LSA-R.S. 23:1142, and the appellate court erred in its subsequent decision to modify the OWC judgment to award the full amount of charges for the prescription medications dispensed by the plaintiff/health care providers after June 5, 2008.[10] Accordingly, we reverse that portion of the appellate court decision that modified the OWC awards to increase the amounts awarded (from $750 to $1,470.02, for Mr. Morris's medication costs, and from $750 to $1,359.65, for Mr. Poole's medication costs).

Penalties and Attorney Fees

The remaining assignment of error presents the issue of whether penalties and attorney fees should have been awarded to the plaintiff/health care providers. Although the OWC did not award penalties and attorney fees, the appellate court reversed that decision and awarded penalties and attorney fees under LSA-R.S. 23:1201(F)(4) ("[F]ailure to provide payment in accordance with this Section . . . shall result in the assessment of a penalty . . . together with reasonable attorney fees for each disputed claim . . . . Penalties shall be assessed in the following manner: . . . (4) In the event that the health care provider prevails on a claim for payment of his fee, penalties as provided in this Section and reasonable attorney fees based upon actual hours worked may be awarded and paid directly to the

---

[10] We note that, in so ruling, the appellate court placed great emphasis on the fact that LUBA did not notify the injured employees of the fact that it had informed LB&J and its physicians that no further physician-dispensed prescription medications would be reimbursed. However, there are no express notice requirements in LSA-R.S. 23:1142. Although there are notice requirements in LSA-R.S. 23:1201.1 (which was enacted by 2013 La. Acts, No. 337), these requirements were not in effect in 2008 when these events transpired. Further, LSA-R.S. 23:1203(E)'s notice requirement (that "[a] payor shall not deny medical care, service, or treatment to a claimant unless the payor can document a reasonable and diligent effort in communicating such information") was not triggered by the particular facts and circumstances of this case since, as far as the injured employee patients were concerned, the prescription drug treatment was not denied; rather, the plaintiff/health care providers were simply instructed to direct the injured employee patients to use their previously-issued prescription cards to obtain their prescriptions from local retail pharmacies instead of from LB&J.

health care provider . . . .").

Because one purpose of the workers' compensation law is to promptly provide compensation and medical benefits to an employee who has suffered injury within the course and scope of employment, a failure to timely provide payment can result in the imposition of penalties and attorney fees except when the claim is reasonably controverted. See **Authement v. Shappert Engineering**, 02-1631, p. 8 (La. 2/25/03), 840 So.2d 1181, 1186-87. See also LSA-R.S. 23:1203(F)(2) ("This Subsection shall not apply if the claim is reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control."). The crucial inquiry in determining whether to impose penalties and attorney fees is whether the payor had an articulable and objective reason to deny payment at the time it took action. See **Authement v. Shappert Engineering**, 02-1631 at p. 11, 840 So.2d at 1188

In the instant cases, the payor, LUBA, denied consent for the dispensing of prescription medications by the plaintiff/health care providers because the cost of the prescription medications that the plaintiffs dispensed was two to eight times greater than if the same medications had been dispensed by a local retail pharmacy, which begs the question of whether a LSA-R.S. 23:1142 denial can be based on an unreasonable fee.

Pertinent to the issue is the following language of LSA-R.S. 23:1203(B): "The obligation of the employer to furnish such care, services, treatment, drugs, and supplies . . . is limited to the reimbursement determined to be *the mean* of the *usual and customary charges* for such care, services, treatment, *drugs*, and supplies, as determined under the reimbursement schedule annually published pursuant to R.S. 23:1034.2 or the actual charge made for the service, whichever is less . . . ." (Emphasis added.) Although not defined in the workers' compensation law, "mean" is used in Section 1203 in the sense of a mathematical average and, as

11

stated in Section 1203, such allowable reimbursement is limited by LSA-R.S. 23:1034.2, which provides for the establishment and promulgation of a "reimbursement schedule" to set forth such average costs for medical expenses. See **Authement v. Shappert Engineering**, 02-1631 at p. 10, 840 So.2d at 1188 ("[T]he obligation of an employer to pay medical expenses is limited to . . . an amount determined under the reimbursement schedule published annually pursuant to LSA-R. S. 23:1034.2.").

With regard to the mean, or average, of the usual and customary charges for drugs, Paragraph (C)(1) of LSA-R.S. 23:1034.2 states: "The reimbursement schedule shall include charges limited to *the mean* of the *usual and customary charges* for such care, services, treatment, *drugs*, and supplies." (Emphasis added.) Paragraph (D) of LSA-R.S. 23:1034.2 directs that "[f]ees in excess of the reimbursement schedule shall not be recoverable against the employee, employer, or workers' compensation insurer."[11] Left open by LSA-R. S. 23:1034.2(D)'s restriction is the possibility that medical fees, even though falling within the amounts set forth in the reimbursement schedule, may be deemed unreasonable, unnecessary, or not "usual and customary," and therefore not subject to compensation under certain circumstances.

Furthermore, the expression of legislative intent set forth in LSA-R.S. 23:1020.1 makes it clear that the reasonableness of medical costs is an important consideration. See LSA-R.S. 23:1020.1(C) ("Legislative intent. The legislature finds all of the following: . . . (2) To facilitate injured workers' return to

---

[11] The reimbursement schedule for pharmaceuticals is promulgated in the Louisiana Administrative Code, Title 40, Part I, in Section 2907, which provides that payment for pharmaceuticals will be the lesser of: (1) the provider's usual charge; (2) the provider/insurer's contracted charge; or (3) the average wholesale price ("AWP") plus a percentage mark-up (of 10% for brand-name pharmaceuticals and 40% for generic pharmaceuticals), plus a dispensing fee (as set by the Louisiana Department of Health and Hospitals for Medicaid). Section 2907 further states that the AWP is that listed in the most recent monthly update of the Annual Pharmacists' Reference Red Book, published by Medical Economics Company, Inc., in Oradell, New Jersey ("Red Book").

employment at a *reasonable* cost to the employer.") (emphasis added).  See also **Church Mutual Insurance Company v. Dardar**, 13-2351, p. 14 (La. 5/7/14), 145 So.3d 271, 281 ("According to the plain words of [LSA-R.S. 23:1203], an injured employee is not entitled to payment for all future medical treatment occasioned by an accident; rather, the employer's liability is limited to that which is necessary. Thus, in order to state a cause of action for and recover medical expenses authorized by the statute, an injured worker must require medical expenses that are *reasonably necessary* for the treatment of a medical condition caused by a work injury.") (emphasis added).

In the instant cases, LUBA contests, as unreasonable, the dispensing of prepackaged prescription medications at a cost ranging from two to eight times greater than if the same medications were individually dispensed by a local retail pharmacy.

LUBA Care Supervisor, Clyde Paul Roy, Jr.'s testimony was submitted to the OWC; he stated that retail pharmacies generally do not deal in prepackaged drugs, which are supplied directly from the drug manufacturers mainly for use in hospitals.  Mr. Roy explained that prepackaged drugs are routinely dispensed in a hospital setting in order to make it easier for nurses to administer medications to hospital patients "instead of having a big bottle that they have to count medication out of."  Mr. Roy also testified that the prepackaged drugs dispensed in a physician's office are generally in multiple pill, sealed packages (the package remains sealed and the physician's staff merely affixes a label and delivers it, sealed, to the patient), which are assigned, for Red Book purposes, a different National Drug Code ("NDC") and AWP than the NDC and AWP assigned for the same medications when packaged for dispensing by a retail pharmacy.  Mr. Roy stated that, because the AWP is two to eight times higher for prepackaged medications than for medications dispensed by retail pharmacies, the

13

reimbursement schedule cost is correspondingly higher.[12] Mr. Roy further testified that, in directing the plaintiff/health care providers to issue prescriptions to injured employee patients that could be filled at local retail pharmacies, LUBA was attempting to "get the exact same drug for half or an eighth of the price" of the amount billed by the plaintiff/health care providers "without costing the claimant anything."[13]

Although plaintiffs' counsel argued before the OWC that LB&J physicians dispensed the prescription medications in-house in order to "keep tabs on" the narcotic medications dispensed and "to keep . . . folks [from] going and shopping for . . . drugs at multiple pharmacies," the testimony presented did not establish an adequate basis for the assertion;[14] nor was there any testimony that the dispensing of prescription medications by LB&J was in any way advantageous to the injured employee patients.

After receiving the testimony and evidence, the OWC judge concluded that "[e]ven if the medication was exactly the same, the lack of pharmacist oversight

---

[12] Mr. Roy also pointed out that the AWP listed in the Red Book is the price set by the manufacturer of the drug.

[13] Mr. Roy also testified that, during 2008, LB&J staff dispensed prescription medications from the private pharmacy stock of each individual LB&J doctor, and the dispensed medications were billed under each doctor's tax identification number. However, Mr. Roy stated that in 2009 a retail pharmacy was opened at LB&J, and this pharmacy, Falcon Pharmacy, was a "[f]ull, complete pharmacy with pharmacy techs" and a licensed, registered pharmacist on duty, which he had personally visited. Mr. Roy further testified that Falcon Pharmacy joined the LUBA pharmacy "network" shortly after it opened, and the LUBA network has thereafter reimbursed Falcon Pharmacy for prescriptions, since the drugs are billed at the much lower network contract price. Mr. Roy's testimony was confirmed by the testimony of LB&J witnesses.

[14] LB&J office manager Simone Clark testified that LB&J "had a problem with forged prescriptions" and that "[p]atients would take a prescription and either change the quantity of the prescription or change how it was dispensed . . . ." Ms. Clark also testified that pharmacies would call to verify the number of pills prescribed when the number appeared to have been changed on a prescription and, if so, the police were called. Ms. Clark indicated that they were concerned about prescriptions that may have been forged, for which outside pharmacies did not call to verify. However, Ms. Clark admitted that "[m]ost of the time" attempts to fill unauthorized, modified LB&J-issued prescriptions were discovered. In contrast, Mr. Roy testified that he had not seen a single instance of prescription forgery by a workers' compensation claimant, and he pointed out that the Pharmacy Board implemented a program for the electronic transmission of prescriptions from a doctor to a pharmacy in order to combat forgery problems associated with the dispensing of narcotic drugs, obviating the need for issuance of written prescriptions, which could be illegally modified.

14

deprived the patient of a level of service that a retail pharmacy provided." The OWC judge was particularly concerned that, although LB&J doctors generally discussed the medications to be prescribed with a patient in terms of what to expect from the medications, LB&J doctors did not go over with patients, or hand out to patients, informational literature about the prescribed medications. Further, the OWC judge pointed to the fact that there was no pharmacist on staff to go over side effects or potential drug interactions with patients and that no LB&J doctor or other employee performed that function. Thus, the OWC judge concluded that the dispensing service received by LB&J patients "was less than the patients would receive at a retail pharmacy," in essence concluding that based on the evidence presented there was no advantage to the injured employee in getting prescription medications directly from LB&J and that receiving deficient prescription dispensing services at LB&J may have been harmful to the injured employees. Further indicating that reasonable cost for prescription medications was an appropriate consideration for a payor and that LUBA had adequately notified LB&J physicians that it would not continue to pay for LB&J-dispensed prescription medications, the OWC judge concluded that LUBA had probable cause to controvert the cost of the prescription medications for which the plaintiff/health care providers sought reimbursement.

Factual findings of an OWC judge are subject to the manifest error standard of review on the OWC's findings of fact; therefore, in order for a reviewing court to reverse an OWC judge's factual findings, it must find that a reasonable factual basis does not exist and the record establishes that the factual findings are clearly wrong. See **Dean v. Southmark Construction**, 03-1051, p. 7 (La. 7/6/04), 879 So.2d 112, 117. See also **Arabie v. CITGO Petroleum Corporation**, 10-2605, p. 4 (La. 3/13/12), 89 So.3d 307, 312; **Mart v. Hill**, 505 So.2d 1120, 1127 (La. 1987).

15

Our review of the record presented in these cases does not reveal the factual findings of the OWC judge to be manifestly erroneous. There was a reasonable basis in the record for the OWC to have found that there was no advantage to the injured employees in having their prescription medications dispensed in-house by LB&J, that the prepackaged drugs dispensed by LB&J cost significantly more than if the drugs had been dispensed by a retail pharmacy, and that LB&J was not providing an equivalent pharmaceutical dispensing service to the injured employee as compared to that generally provided by a full-service retail pharmacy. Furthermore, evidence was presented upon which the trier-of-fact could have found that the dispensing of prepackaged medications in a doctor's office setting, rather than a hospital setting, was not "necessary" or "usual and customary," as required by LSA-R.S. 23:1034.2 and 23:1203. Nor do we find, under the specific facts and circumstances present in the instant cases, legal error in the OWC decision that reasonableness of the cost of the prescription medications was a factor that the payor, LUBA, was entitled to consider in the application of LSA-R.S. 23:1142. Therefore, the OWC did not err in concluding that LUBA reasonably controverted that portion of the prescription medication costs, charged by the plaintiff/health care providers, that exceeded the $750 limit set forth in LSA-R.S. 23:1142.

Nevertheless, the parties do not dispute that, under LSA-R.S. 23:1142, $750 of the nonemergency treatment charges are enforceable, as Section 1142 provides that a health care provider "may not incur **more than** a total of seven hundred fifty dollars in nonemergency diagnostic testing or treatment without the mutual consent of the payor and the employee" and "that portion of the fees for nonemergency services of each health care provider **in excess of** seven hundred fifty dollars shall not be an enforceable obligation against the employee or the employer or the employer's workers' compensation insurer unless the employee and the payor have

16

agreed upon the diagnostic testing or treatment by the health care provider."

(Emphasis added.)   Thus, we examine whether the defendants reasonably

controverted, i.e. had an articulable and objective reason to deny, payment of $750

in costs for each of the injured employee patients here.

With respect to the cost of the nonemergency treatment at issue in this case,

the November 25, 2014 OWC written reasons for judgment noted only that

"LUBA paid the $750 when the **Rebel [Distributors Corp. v. LUBA Workers'**

**Comp.**, 12-0909 (La. App. 3 Cir. 4/2/14), 137 So.3d 91] case was published."

Further, the only testimony as to why LUBA waited until 2014 to pay the $750 in

nonemergency treatment costs, incurred for each of the instant injured employee

patients in 2008, was presented during the February 24, 2014 OWC hearing in a

colloquy between LUBA representative C. Paul Roy and LB&J's counsel, as

follows:

> [By Counsel for LB&J:] . . . At any time, did you try to pay either the
> fee schedule or the contracted rate that you now have on these bills, in
> particular?
>
> [By Mr. Roy:]  No, sir.
>
> * * *
>
> [By Counsel for LB&J:]  And these -- these bills are still unpaid six
> years later, correct?
>
> [By Mr. Roy:]  Yes, sir.
>
> * * *
>
> [By Counsel for LB&J:]  . . . [O]nce we tried [a related] case last
> January and we got the opinion from [the OWC judge] saying that you
> were required to reimburse Drs. Blanda and Cobb for the medications
> that were dispensed in the office, LUBA did not appeal that, and
> instead paid those bills to Dr[s]. Blanda and Cobb, correct?
>
> [By Mr. Roy:]  Yes, sir.
>
> [By Counsel for LB&J:] Okay.  At that time, . . . why did LUBA not
> pay the other identical prescriptions that were at -- at issue in the
> sixteen other cases involving LUBA and Drs. Blanda and Cobb?
>
> [By Mr. Roy:]  We had referred to our counsel and said that we were
> willing to pay all owed bills according to that decision, and the

17

response we got back was that the request had been made for us to pay penalties and fees for each one of those cases. And in the case [tried last January], there was no penalties and attorneys' fees assigned, so we were willing to pay based on that decision, but we were not willing to pay penalties and attorneys' fees for all of those cases.

[By Counsel for LB&J:]  Well, you're talking about whether or not the plaintiffs would have settled the entire case by you paying those bills, but what would have kept you from just making a payment on those bills and leaving the issue out there for penalties and attorneys' fees?

[By Mr. Roy:]  . . . [W]e get 1008 suits all the time that are questionable, at best. And we're more than willing, [the] majority of the time, to cover the amounts that aren't paid. But that doesn't stop attorneys from continuing to press the issue and bring it to court and ask for penalties and attorneys' fees. So, the -- the offer was made to tender the amount that was owed on all bills, and the answer we got back was, "We're not willing to accept that offer unless you pay penalties and attorneys' fees for all of them."

[By Counsel for LB&J:]  Let me just get it clear for the record. You didn't make an offer to tender it. You could have just gone ahead and tendered payment. Y'all just offered to pay that in [the] way of settlement of all the claims, correct? In other words, you wanted a release from all the claims for penalties and attorneys' fees, and all that, right?

[By Mr. Roy:]  I'm guessing so. I mean, we --

[By Counsel for LB&J:]  Okay.

[By Mr. Roy:]  -- we -- like I said we went through our counsel for all of that. And I know it's -- at one point, there was even a -- a dispute [about] . . . the amount that was owed, because the amount that I had on record that we owed was -- was different than the amount that our attorney was being given. And -- and not that we were saying we didn't owe all of that that was being stated, we just didn't have a -- a bill on record to indicate the same amounts. And -- and I had asked that we actually get a copy of all those bills so that we knew exactly what was owed, but I never received all of that.

[By Counsel for LB&J:]  Well, I've been involved in a lot of these PPO cases, and sometimes we'll actually get checks that are tendered for amounts in dispute; although, there's no settlement yet in the case. But there's just a payment made . . . and we typically will forward those on to the healthcare providers. We don't turn down any tenders of payment. You didn't make any kind of a tender like that, did you?

[By Mr. Roy:]  No, sir.

The testimony presented on this issue fails to show that LUBA had an

18

objective reason for failing to pay the $750 per patient owed. Even though the plaintiffs were demanding payment of the entire billed amount as well as penalties and attorney fees, LUBA could have tendered only $750 per patient, an amount it admitted was owed under LSA-R.S. 23:1142. Consequently, penalties and attorney fees were properly imposed by the appellate court in these cases, and we affirm that portion of the appellate court decision.

## DECREE

As set forth hereinabove, we reverse, in part, the appellate court's modification of the amount awarded by the OWC and affirm, in part, the decision of the appellate court to award penalties and attorney fees.

**REVERSED IN PART; AFFIRMED IN PART**.

# SUPREME COURT OF LOUISIANA

## NO.  2015-C-2137

## LAFAYETTE BONE & JOINT CLINIC (CHARLES MORRIS), ET AL. VERSUS LOUISIANA UNITED BUSINESS SIF, ET AL.

## CONSOLIDATED WITH

## NO. 2015-C-2138

## LAFAYETTE BONE & JOINT CLINIC (CHARLES POOLE, JR.), ET AL. VERSUS GUY HOPKINS CONSTRUCTION CO., INC., ET AL.

**KNOLL, Justice,** concurring.

While I agree with the majority's holdings regarding the choice-of-pharmacy issue, mutual consent, and the imposition of penalties and attorney fees, I find its discussion and interpretation of La. R.S. 23:1203 and 1034.2 unnecessary. Rather I would review the penalties and attorney fees issue strictly from a La. R.S. 23:1142 context and find the record evidence reveals LUBA lacked an objective reason for failing to pay the statutorily mandated $750 owed per patient.  For this reason, I respectfully concur.

06/29/2016

# SUPREME COURT OF LOUISIANA

### NO. 2015-C-2137

## LAFAYETTE BONE & JOINT CLINIC (CHARLES MORRIS), ET AL.
### VERSUS
## LOUISIANA UNITED BUSINESS SIF, ET AL.

### CONSOLIDATED WITH

### No. 2015-C-2138

## LAFAYETTE BONE & JOINT CLINIC (CHARLES POOLE, JR.), ET AL.
### VERSUS
## GUY HOPKINS CONSTRUCTION CO., INC., ET AL.

*ON WRIT OF CERTIORARI TO THE COURT OF APPEAL, THIRD CIRCUIT,*
*OFFICE OF WORKERS' COMPENSATION, DISTRICT 4*

**WEIMER, J.**, dissenting.

Respectfully, in my estimation, the majority neatly but erroneously sidesteps the issue which has split the circuits: whether the employer/payor has the right to determine where the employee can have a prescription filled and whether the dispensing of prescription medication constitutes "nonemergency diagnostic testing or treatment" so as to trigger the provisions of La. R.S. 23:1142.

The dispensing of medication (as distinguished from prescribing or administering medication) is neither nonemergency diagnostic testing nor nonemergency treatment. Louisiana R.S. 23:1142(B), by its language, governs "nonemergency diagnostic testing" and "nonemergency ... treatment"; thus, La. R.S. 23:1142(B), by its language, does not apply to the dispensing of medication. See **Rebel Distributors Corp., Inc. v. LUBA Workers' Comp.**, 12-909, p. 1 (La.App. 3 Cir. 4/2/14), 137 So.3d 91, 101 (Thibodeaux, C.J., dissenting in part). Accordingly, under the law as written, the employee's recovery for costs of dispensed medication is not capped at $750.

The employer is required by La. R.S. 23:1203 to supply medication. Unlike La. R.S. 23:1121(B), governing the selection of a "treating physician," the employee is not afforded an absolute right to select a pharmacy. With the employer's obligation to supply medication comes the authority to advise what pharmacy can be used by the employee, provided the employer's/payor's direction in this respect is not arbitrary or capricious and provided, of course, that the medication is furnished in a timely fashion.[1] See **Downs v. Chateau Living Ctr.**, 14-672, p. 9 (La.App. 5 Cir. 1/28/15), 167 So. 3d 875, 881; **Bordelon v. Lafayette Consolidated Government**, 14-304, pp. 2-3 (La.App. 3 Cir. 10/1/14), 149 So.3d 421, 422-23, writ denied, 14-2296 (La. 2/6/15), 158 So.3d 816; **Sigler v. Rand**, 04-1138, pp. 14-15 (La.App. 3 Cir. 12/29/04), 896 So. 2d 189, 198, writ denied, 05-0278 (La. 4/1/05), 897 So. 2d 611.

Acting within the statutory scheme, the payor advised Lafayette Bone & Joint Clinic that it was not an acceptable provider of medication and instructed it to cease from dispensing medications to the employees in question.[2] This was a rational choice made by the payor given the cost differences involved.[3] Accordingly, under the facts of this case, the payor is not legally responsible for the cost of the medication dispensed once the payor notified Lafayette Bone & Joint Clinic to stop dispensing

---

[1] In this case, the payor gave the employee a lengthy list of pharmacies from which prescription drugs could be obtained at "no out-of-pocket" cost to the employee. See **Lafayette Bone & Joint Clinic (Charles Morris) v. Louisiana United Business SIF**, 15-2137, 15-2138 (La. __/__/16), slip op. at 2 n.2. There is no evidence in this case that the use of these pharmacies would inconvenience the employees in any way or that these pharmacies were unavailable to the employees.

[2] Lafayette Bone & Joint Clinic ignored the notifications and continued to dispense medication to these employees rather than utilizing the procedures set forth in the workers' compensation law for challenging the insurer's refusal to include Lafayette Bone & Joint Clinic in its list of approved pharmaceutical providers. See **Lafayette Bone & Joint Clinic (Charles Morris)**, 15-2137, 15-2138, slip op. at 8-9.

[3] As noted by the majority, the payor "was attempting to 'get the exact same drug for half or an eighth of the price' of the amount billed by the plaintiff/health care providers 'without costing the claimant anything.'" **Lafayette Bone & Joint Clinic (Charles Morris)**, 15-2137, 15-2138, slip op. at 14.

2

medication to these employees.  For this same reason, the Office of Workers' Compensation judge did not err in failing to assess penalties and attorney fees.

For these reasons, I respectfully dissent.

06/29/2016

SUPREME COURT OF LOUISIANA

No. 2015-C-2137

LAFAYETTE BONE & JOINT CLINIC (CHARLES MORRIS), ET AL.
VERSUS LOUISIANA UNITED BUSINESS SIF, ET AL.

CONSOLIDATED WITH

No. 2015-C-2138

LAFAYETTE BONE & JOINT CLINIC (CHARLES POOLE, JR.), ET AL.
VERSUS GUY HOPKINS CONSTRUCTION CO., INC., ET AL.

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL, THIRD
CIRCUIT, OFFICE OF WORKERS' COMPENSATION, DISTRICT 4

Guidry, J., concurs and assigns reasons.

I concur in the result but write separately to express my view that the payor

acted within its authority to withdraw authorization from the physicians to dispense

medications to LUBA claimants. The employer's duty to furnish prescription

medications is addressed in La. R.S. 23:1203(A): "the employer shall furnish all

necessary drugs, . . . and shall utilize such state, federal, public, or private facilities

as will provide the injured employee with such necessary services." However, the

employer does not violate its obligation to the employee when it chooses to have

his prescriptions filled by a different pharmaceutical company, so long as that

choice is reasonable and there are no deficiencies in the filling of the employee's

prescriptions in a timely manner. *See Downs v. Chateau Living Ctr.*, 14-672, p. 9

(La.App. 5 Cir. 1/28/15), 167 So. 3d 875, 881; *Bordelon v. Lafayette Consolidated

Government*, 14-304, pp. 2-3 (La.App. 3 Cir. 10/1/14), 149 So.3d 421, 422-23, *writ

denied*, 14-2296 (La. 2/6/15), 158 So.3d 816; *Sigler v. Rand*, 04-1138, pp. 14-15

(La.App. 3 Cir. 12/29/04), 896 So. 2d 189, 198, *writ denied*, 05-0278 (La. 4/1/05),

897 So. 2d 611.

1

Here, the payor invited comment before ultimately placing the plaintiff/health care provider on notice that LUBA would no longer reimburse for physician-dispensed medication because it is significantly more expensive under the workers' compensation fee schedule than the same medication obtained from a retail pharmacy. That decision by the payor was not shown to be unreasonable or to result in any deficiencies in filling the employee's prescriptions, as the record established the employee could present his prescription to any retail pharmacy. Moreover, the OWC judge found there was a substantial benefit to employees in having their prescriptions managed by a licensed pharmacist. Accordingly, under the facts of this case, I do not find the payor was legally responsible for the cost of medication dispensed after the plaintiff/health care provider was placed on notice, subject to the reimbursement restriction in La. Rev. Stat. 23:1142.

2