McCALLUM, J.
In this Worker's Compensation case, the pro se appellant is Diedre Emerson ("Emerson" or the "plaintiff"), a former certified nurse assistant ("CNA") employed by Willis Knighton Health System ("Willis Knighton"). Emerson filed a Disputed Claim for Compensation describing her injury as follows: "Mental, Distress - Hyperventilation - Stroke like symptoms." The alleged injury occurred on October 1, 2016. After trial on the merits, the Worker's Compensation Judge ("WCJ") denied compensation on the grounds that Emerson failed to carry her burden of proof. For the reasons stated herein, we affirm.
FACTS
The parties stipulated that Emerson was an employee of Willis Knighton at the time of the alleged injury. Initially, she was a full-time employee, but later changed to part-time work to facilitate her going to nursing school. Her work schedule on the weekend in question was 7:00 p.m. to 7:00 a.m. on three consecutive nights - Friday, September 30, 2016, through Sunday, October 2, 2016. She worked on the cancer floor at Willis Knighton, which had a maximum capacity of 40 patients.
*245 When Emerson arrived at work that Friday evening, she found that the prior shift had left much of their work undone, which would require her to do extra work. Specifically, she stated it was her responsibility to record the patients' vital signs upon arriving for work, but she could not because the patients were all "hollering for water." Additionally, the previous shift had left the lunch trays in the patients' rooms, and had not given the patients ice. She further testified that she could not get any of the nurses to help because they were all busy as well. Emerson also admitted that the situation was just more of the "same old, same old" thing, and that the day shift left their work for the night shift "numerous" times.[1]
Upon learning that she would be responsible for the work allegedly leftover from the previous shift in addition to her immediate duty of taking vital signs of all the patients, she became "so upset... so upset...so mad." While she was taking vital signs, distributing ice, and helping patients to the bathroom, she felt "something loose-like, pop-like" in her head. Emerson admitted that "nothing happened physically" to cause the "pop" in her head.[2]
After the "pop," Emerson "broke down and started crying." She did not feel pain, but felt "out of [her] body," light-headed, anxious, and as if she could not think. Emerson was with the charge nurse when this occurred, and the charge nurse summoned the house supervisor, who talked with Emerson and then reassigned her to a different floor for the night.
After her shift ended the morning of Saturday, October 1, 2016, Emerson went to the park and sat for a while in the hope that she would feel better by calming down. Once Emerson determined sitting in the park did not make her feel better, she went to the LSU Medical Center emergency room. She testified that, in the emergency room, she was still crying uncontrollably and reported having weakness in her left side. The medical records from that visit do not indicate that she complained of weakness on her left side.[3] They indicate that her "chief complaint" was "nervousness" and "hyperventilation," and that she had difficulty sleeping as well as elevated blood pressure. Dr. Gregory Patek diagnosed Emerson with anxiety and "stress at work."[4] He prescribed her Atarax and naproxen, and excused her from work until October 3, 2016.
*246 Willis Knighton requires that employees who cannot work their shift give notice thereof a certain number of hours in advance. Emerson was allegedly tardy in calling Willis Knighton to give notice that she would miss one of her remaining shifts that weekend. She was, for that reason, fired on Monday, October 3, 2016.
Emerson also testified that she returned to the LSU Medical Center emergency room on November 29, 2016 - approximately two months after the incident for which she seeks workers' compensation. She was then diagnosed with a stroke and a blockage in her right carotid artery. Emerson testified that it is undetermined whether the blockage is from a blood clot or from plaque buildup.[5]
The medical records from this visit contain the following narrative:
Diedre Emerson is a 50-year-old female with no significant medical history, presented with new onset of left-sided weakness since 11:00 AM today. She arrived at least 7 h after the onset of her symptoms. Patient c/o LUE and LLE weakness, inability to ambulate, report symptoms started after argument on the phone with family followed by panic attack. Symptoms are not improving. Patient reports similar event in October of current year and lasted for about one week, followed by complete resolution. Patient was told that she has HTN during her last PCP visit last year, she is currently not on treatment. She denies headache, vision changes, dizziness, LOC, chest pain or SOB. Neurology was consulted for possible CVA/TIA evaluation.
These records also reflect "Admission Diagnoses" of CVA (cerebral vascular accident); left-sided weakness; transient cerebral ischemia, unspecified type; as well as "Discharge Diagnoses" of right MCA territory stroke, and ANA positive. Her medical records from November 29, 2016, also indicate a "right ICA total occlusion per U/S carotid."
The WCJ denied Emerson's claims on the ground that Emerson failed to carry her burden of proof in that: (1) Emerson did not prove that she had an injury under section 1021(8)(a); (2) Emerson did not prove that her mental injury was caused by sudden, unexpected, and extraordinary stress related to the employment or that she was diagnosed with a mental injury by a psychiatrist or psychologist; and (3) even if Emerson did suffer a perivascular injury on October 1, 2016, she failed to prove that it was predominantly caused by work-related stress as opposed to a preexisting condition. Emerson admits that she has not consulted a psychologist or psychiatrist regarding the "injury" for which she now claims compensation.
In this appeal, Emerson, who is not represented by counsel, argues mainly that (1) she should be excused from having to prove that she was diagnosed with a mental injury by a psychiatrist or psychologist; and (2) she did have a transient ischemic attack (stroke ) while working at Willis Knighton on October 1, 2016.
DISCUSSION
Standard of review
Factual findings of a WCJ are subject to the manifest error standard of review; therefore, in order for a reviewing court to reverse a WCJ's factual findings, it must find that a reasonable factual basis does not exist and the record establishes that the factual findings are clearly wrong.
*247 Lafayette Bone & Joint Clinic v. Louisiana United Bus. SIF, 2015-1303 (La. 6/17/16), 194 So.3d 1112 ; Dean v. Southmark Const. , 2003-1051, p. 7 (La. 7/6/04), 879 So.2d 112, 117.
Ultimately, the issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. If the factual findings are reasonable in light of the record reviewed in its entirety, a reviewing court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Stobart v. State through Dep't of Transp. & Dev. , 617 So.2d 880, 883 (La. 1993) ; Dombrowski v. Patterson-UTI Drilling Co., 46, 249 (La. App. 2 Cir. 4/13/11), 63 So.3d 308. Accordingly, where two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Henderson v. Nissan Motor Corp., 2003-606 (La. 2/6/04), 869 So.2d 62, 69, citing Stobart, supra.
Worker's Compensation Law
La. R.S. 23:1021(8) ("section 1021(8)") defines those injuries which entitle the employee to compensation when sustained under certain circumstances. Relevant in this case are "injury" under section 1021(8)(a); "mental injury caused by mental stress" under section 1021(8)(b); and "heart-related or perivascular injury" under section 1021(8)(e).
Injury. Section 1021(8)(a) defines the terms "injury" and "personal injury" as including "only injuries by violence to the physical structure of the body and such disease or infections as naturally result therefrom." It further states: "these terms shall in no case be construed to include any other form of disease or derangement, however caused or contracted." Id.
Emerson admitted that "nothing happened physically" to cause the "pop" in her head. The context indicates that in saying "nothing happened physically," she meant there was no physical violence or physical trauma that caused the pop. The WCJ asked Emerson whether she hit anything, anyone hit her, or if she had suffered a fall. In addition to stating that "nothing happened physically," Emerson denied each of these things. Accordingly, the WCJ was not manifestly erroneous in concluding that Emerson failed to prove entitlement to compensation under section 1021(8)(a).
Mental injury. Section 1021(8)(b) provides as follows:
Mental injury caused by mental stress. Mental injury or illness resulting from work-related stress shall not be considered a personal injury by accident arising out of and in the course of employment and is not compensable pursuant to this Chapter, unless the mental injury was the result of a sudden, unexpected, and extraordinary stress related to the employment and is demonstrated by clear and convincing evidence.
Furthermore, section 1021(8)(d) provides:
No mental injury or illness shall be compensable under either Subparagraph (b) or (c) unless the mental injury or illness is diagnosed by a licensed psychiatrist or psychologist and the diagnosis of the condition meets the criteria as established in the most current issue of the Diagnostic and Statistical Manual of Mental Disorders presented by the American Psychiatric Association.
Thus, to establish entitlement to compensation for a "mental injury resulting from work-related stress," an employee must prove: (1) that he or she suffered a mental injury; (2) the mental injury was caused by a sudden, unexpected, and extraordinary stress related to the employment;
*248 and (3) the mental injury was diagnosed by a licensed psychiatrist or psychologist in accordance with the criteria of the Diagnostic and Statistical Manual of Mental Disorders ("DSM-MD").
The WCJ found that plaintiff failed to prove that the mental injury was caused by "a sudden, unexpected, and extraordinary stress related to the employment." Emerson admitted that the day shift left their work for the night shift "numerous" times prior to October 1, 2016, and that the situation that day was just more of the "same old, same old" occurrences. Ms. Opal Darrett's testimony showed that the department of Willis Knighton in which the plaintiff worked had been understaffed for some time as of the date of the plaintiff's mental injury, and that the understaffing resulted in the plaintiff being overworked. It also showed that the plaintiff was anxious and stressed by this situation prior to October 1, 2016. Therefore, we find that the WCJ reasonably concluded that the plaintiff's work-related stress was "regular" as opposed to sudden, unexpected, and extraordinary.
Additionally, the WCJ determined that the plaintiff failed to prove that the mental injury was diagnosed by a licensed psychiatrist or psychologist in accordance with the DSM-MD. The plaintiff conceded in her testimony that she was not diagnosed by a psychologist or psychiatrist. There was no manifest error in these findings by the WCJ. This constitutes a separate and independent reason that the plaintiff's claim of a compensable mental injury must fail.
Heart-related or perivascular injury . Section 1021(8)(d) provides:
(e) Heart-related or perivascular injuries. A heart-related or perivascular injury, illness, or death shall not be considered a personal injury by accident arising out of and in the course of employment and is not compensable pursuant to this Chapter unless it is demonstrated by clear and convincing evidence that:
(i) The physical work stress was extraordinary and unusual in comparison to the stress or exertion experienced by the average employee in that occupation, and
(ii) The physical work stress or exertion, and not some other source of stress or preexisting condition, was the predominant and major cause of the heart-related or perivascular injury, illness, or death.
To establish entitlement to compensation for a "heart-related or perivascular injury" under paragraph (d) of section 1021(8), an employee must prove the following three elements: (1) that the employee suffered a heart-related or perivascular injury; (2) the physical work stress of the employee's job was extraordinary and unusual in comparison to the stress or exertion experienced by the average employee in that occupation; and (3) the physical work stress or exertion, and not some other source of stress or preexisting condition, was the predominant and major cause of the perivascular injury. The plaintiff must prove all of these elements by clear and convincing evidence.
Initially, we note that Ms. Emerson's medical records from her October 1, 2016, emergency room visit bear no indication that she was diagnosed with a heart-related or perivascular injury. Rather, she was diagnosed with only anxiety and stress. She was not diagnosed with a stroke until her November 29, 2016, trip to the emergency room, which was precipitated by a separate episode of symptoms. In the medical records from that incident, we find no official diagnosis stating that the October 1, 2016, incident was a *249 "stroke," a "transient ischemic attack" or a "cerebral vascular accident."[6] Thus, the WCJ could have reasonably concluded that Ms. Emerson failed to carry her burden of proving that she suffered a heart-related or perivascular injury while working for Willis Knighton. For this reason alone, the WCJ's finding that Emerson failed to prove entitlement to compensation under section 1021(8)(d) was not manifestly erroneous.
The WCJ focused on Ms. Emerson's failure to prove that the physical work stress, and not some other source of stress or preexisting condition, was the predominant and major cause of the perivascular injury. Ms. Emerson testified that in connection with her November 29, 2016, emergency room visit, the doctors determined that she had a carotid artery blocked by either plaque or a blood clot. Thus, the WCJ reasoned, even assuming that Ms. Emerson did suffer a heart-related or perivascular injury on October 1, 2016, it was predominantly caused by a preexisting condition rather than work stress. This constitutes a second reason that the WCJ committed no manifest error regarding section 1021(8)(d).
CONCLUSION
For the reasons assigned above, the decision of the WCJ is affirmed. Costs are assessed to Diedre Emerson in accordance with La. C.C.P. arts. 5186 and 5188.
AFFIRMED.
APPLICATION FOR REHEARING
Before Daniel Milton Moore III, Frances Jones Pitman, Jeff Cox, James Mark Stephens, and Jay Bowen McCallum, JJ.
Rehearing denied.

Two witnesses who testified at trial, Opal Darrett and Carolyn Fletcher, corroborated Emerson's testimony that she often wound up being responsible for others' work and that she often worked in an understaffed situation at Willis Knighton.

The context of this statement indicates that when she said "nothing happened physically," she meant there was no type of physical violence or physical trauma associated with the pop in her head. Specifically, the WCJ asked Emerson whether she hit anything, anyone hit her, or she had a fall. Emerson denied all of these things. However, she later asserted that it was overexertion which caused the pop in her head.

Specifically, under the heading of "neurological," they report that Emerson was "negative for dizziness, facial asymmetry, weakness , lightheadedness and headaches." (Emphasis added). Additionally, in the "HPI Comments" section of the medical records, it states: "has adversarial relationship with the charge nurse at work. Has to go in front of hospital committee on Monday. Can't sleep and stressed about future as she is going to nursing school."

Elsewhere in Emerson's medical records from her October 1, 2016, emergency room visit, under the heading of "final diagnoses," the following three items are listed: "generalized anxiety disorder"; "reaction to severe stress, unspecified"; "nicotine dependence, cigarettes, uncomplicated."

She claims that this blockage was asymptomatic until the incident on October 1, 2016, and that, as of trial, she did not return to the condition she was in prior to that incident.

In the medical records, the only assertion that the October 1, 2016, incident was a stroke is the following statement by occupational therapist Sharon Graff in the "Occupational Therapy Inpatient Initial Evaluation/plan of care": "Pt was Mod I with ADLs, attending nursing school and was a nurse tech for many years until the first 'TIA' in October." Graff's placement of quotation marks around TIA (transient ischemic attack ) could be reasonably interpreted as meaning that it was merely Emerson's opinion that the October 1, 2016, incident was a transient ischemic attack. Regardless, in view of the medical records as a whole, the statement does not constitute clear and convincing evidence that Emerson was diagnosed with a transient ischemic attack in connection with the October 1, 2016, incident.